COMMONWEALTH vs. ROBERT GUILIANA.

Middlesex.   April 5, 1983. — November 21, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Insanity. Practice, Criminal,* Capital case.

A defendant's conviction of murder in the first degree was against the weight of the evidence at his trial and presented a substantial likelihood of a miscarriage of justice, necessitating this court's ordering a new trial pursuant to its powers under G. L. c. 278, § 33E, where the defense had introduced extensive lay testimony as to the defendant's bizarre behavior before, during, and after the killing, as well as the testimony of four expert witnesses demonstrating that the defendant lacked criminal responsibility, and where the Commonwealth had failed to support with medical testimony its theory that the defendant's actions were the result of voluntary ingestion of drugs. [469-471]

INDICTMENT found and returned in the Superior Court on February 24, 1978.

The case was tried before *Young, J.*

*Carlo A. Obligato* for the defendant.

*Pamela L. Hunt,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J.  The defendant, Robert Guiliana, was convicted of murder in the first degree for the December 15, 1977, slaying of a neighbor, Dorothy Cyr.[1]  The principal issue at trial was the defendant's criminal responsibility.  In support of his claim that he lacked criminal responsibility, the defendant offered the testimony of four experts as well as a number of lay witnesses.  The jury re-

---

[1] The defendant was sentenced to life imprisonment at the Massachusetts Correctional Institution, Walpole.

jected the defendant's claim that he was not criminally responsible for the homicide. The defendant appeals, claiming that the verdict is against the weight of the evidence. Pursuant to G. L. c. 278, § 33E, he asks that we grant him a new trial. We conclude that the verdict is against the weight of the evidence, and that there is a substantial likelihood of a miscarriage of justice. Therefore, we reverse and remand for a new trial.

We summarize the facts. On the day of the killing, the defendant lived with his mother in the second floor apartment of a three-story house in Somerville. The victim and her husband and two children occupied the third-floor apartment. At approximately 3 p.m., the owner of the building, who lived on the first floor, called the police after hearing the sounds of shattering glass emanating from the second-floor apartment and someone "thundering" down the backstairs. About the same time, a neighborhood child saw the defendant in the back yard. The defendant wore only dungarees and carried a baseball bat that appeared to have blood on it. The defendant ran toward the child yelling, "Come here. Come here."

The child fled, and the defendant ran to a nearby street where two young men were entering a parked automobile. The defendant jumped into the back seat and then reached out and banged on the roof, shouting repeatedly, "Give me the keys." Then he pulled a green plastic trash bag over his head and chest and screamed, "Take me out of here." The defendant jumped out of the car.

A police officer, observing a bare-chested man (the defendant) in the street talking to a group of youths, stopped his cruiser. The defendant jumped into the back seat of the cruiser and said, "Get me out of here." The officer told the defendant that he had to respond to a call but would help the defendant when he finished.[2] As he spoke to the defendant, the officer looked in the rear view mirror. The defendant said, "Turn around and look at me, my face

---

[2] The call was from the defendant's landlady.

when you talk to me." The defendant appeared emotion-ally distraught.

At the scene of the crime, police officers discovered the victim's body lying against a fence. Her head had been se-verely beaten, and the fatal injuries were consistent with those inflicted by a blunt instrument, such as a baseball bat.[3] A baseball bat with the name "Bob" engraved on it was found in the street.

The officer who had picked up the defendant remained with him at the scene of the slaying for a few minutes and then drove the defendant to the police station. At the sta-tion, the defendant was given the warnings required by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and signed a printed form advising him of his rights. The defendant an-swered the standard booking questions. Some of his an-swers were "disjointed." He also responded to police statements during interrogation. At the police station and at the house while in the company of the police, the defend-ant appeared calm and had an expressionless stare.

The defense claimed that the defendant lacked criminal responsibility at the time of the crime. In support of his claim, the defendant presented four expert and four lay wit-nesses. The lay witnesses stated that the defendant's life had been punctuated by a series of tragic events, including the deaths of close family relatives, friends, and his girl friend, and recounted the defendant's history of emotional problems,[4] including auditory and visual hallucinations, and bizarre and irrational thinking, up to and including the morning of the killing.[5]

---

[3] The victim died from a massive skull fracture and brain lacerations.

[4] Although the defendant had not been hospitalized for mental illness, there was evidence that the defendant had sought psychiatric help on a number of occasions since high school. He was admitted to Mattapan State Hospital for a ten-day period of observation. Each time he was diagnosed as suffering from emotional problems.

[5] Lay witnesses said that the defendant had heard voices and seen vi-sions for some time, and that this irrational thinking had increased prior to the killing. After his girl friend's death in 1974, he attempted to com-

The experts[6] testified that the defendant told them that he believed he was President of the United States, and that the CIA and the FBI were spying on him through his television set. The night before the killing, the defendant made a speech from his front porch about an impending war. Following the speech, he told his mother that he was resigning the Presidency. Next, he believed that his mother was a black woman in disguise, armed with a knife, and had a gun under her dress. That night, the defendant turned on his television and rotated the dials so that he could survey the whole world. He saw death and destruction everywhere. He believed that everyone was in hell. He saluted the television set and went to bed.

According to the psychiatrists, some time after 4 A.M., on December 15, the defendant turned on the radio, which he said emitted a red laser beam that would have burned him had he not eluded it. He looked out in the street, saw no one, and remembered that everyone, including his parents, was dead. He began to prepare himself for death by putting on a raincoat and attempting to take a shower.

The psychiatrists said that the defendant told them that later that morning a bomb dropped and plaster fell from the ceiling, and that this signaled the start of World War III. He thought that he was in enemy territory, and that he had to get to a position of safety. The defendant picked up a baseball bat and smashed open the door.

The defendant saw a woman standing in the doorway. He told the psychiatrists that he believed she was a Russian spy in uniform. He said that he could not let her return

---

municate with her and his dead dog. On several occasions he saw bats flying in the sky and thought people were going to kill him.

On December 15, 1977, the defendant telephoned a friend and, in a rapid and upset manner, talked about God and the Bible, said that his cousin had died, and said that he could not go on unless he had support.

[6] Three of the experts were psychiatrists, one of whom was the medical director of Bridgewater State Hospital. The fourth expert was a clinical psychologist and the assistant medical director at Bridgewater. The defendant's statements to the four experts were substantially similar.

safely to the enemy lines because this would jeopardize his own safety. Bat in hand, he chased her to the third floor and smashed down the door. He chased her through the apartment down the backstairs. When the defendant caught her in the driveway, he hit her on the head eight or nine times. He then believed that he was a caveman who had killed his first beast and "thought that he should drink the blood." The defendant believed that the killing was perfectly proper even though "God doesn't want you to kill," because, in his mind, the victim was a Russian spy, and killing in wartime was necessary to protect his country as well as himself.

After the killing, the defendant said that he ran out into the street in order to round up an army, which would consist of Italians and anyone else who would follow him. He believed the young men, whose car he entered, were joining the "Italian" army, and that the officer who drove him back to his house was taking him to a place of refuge behind United States' lines.

All of the experts concluded that the defendant was suffering from a mental disease, schizophrenia, paranoid type, and was not criminally responsible for his conduct. Each was of the opinion that the defendant's history of drug use, which was derived from his statements or medical records, would not affect that conclusion. The experts conceded that the reaction caused by voluntary ingestion of amphetamines can resemble those of paranoid schizophrenia. However, each of them said that in his opinion the defendant was not suffering from an amphetamine psychosis on December 15, 1977, and that he suffered from schizophrenia, paranoid type, a serious mental disease. Each expert said that the defendant lacked both substantial capacity to conform his conduct to the requirements of the law, and substantial capacity to appreciate the wrongfulness of his conduct. Each concluded that the defendant was not criminally responsible for his conduct on December 15, 1977.[7]

_____

[7] The defendant argues that unanimity of expert opinion that the defendant lacked criminal responsibility required the judge to grant his

*Relief pursuant to G. L. c. 278, § 33E.* Our duty under
G. L. c. 278, § 33E, is to examine "the whole case . . . on
the facts as well as the law . . . [and] to order a new trial if
justice so requires." *Commonwealth v. Brown,* 376 Mass.
156, 168 (1978). "Under G. L. c. 278, § 33E, it is appropri-
ate for this court to consider whether the verdict of convic-
tion of murder . . . was against the weight of the evidence
considered in a large or nontechnical sense," *Commonwealth
v. Bowman,* 373 Mass. 760, 765 (1977), in order to ensure
that the result is "consonant with justice," *Commonwealth v.
Baker,* 346 Mass. 107, 109 (1963). See *Commonwealth v.
Seit,* 373 Mass. 83, 94 (1977). Reviewing the whole case, we
conclude that the verdict is against the weight of the
evidence, and that there is a substantial likelihood of a
miscarriage of justice. Therefore, pursuant to G. L. c. 278,
§ 33E, we reverse and remand for a new trial.

The Commonwealth's theory was that the crime was sole-
ly the result of the voluntary use of drugs (amphetamines).[8]

---

motion for a verdict of not guilty by reason of insanity. However, the
jury is free to disbelieve all the evidence produced by the defense. See
*Commonwealth v. Shelley,* 381 Mass. 340, 347 (1980). Further, the de-
fendant is not entitled to a required finding even if the Commonwealth
fails to present expert testimony. See *Commonwealth v. Lunde, ante* 42,
47 (1983), and cases cited.

The defendant argues that, pursuant to G. L. c. 278, § 33E, the judge
should have granted his motion for a required finding of not guilty made
at the close of the Commonwealth's evidence, because the evidence was
insufficient to support the inference that he killed the victim with deliber-
ately premeditated malice aforethought. The defendant did not make
this argument below and "cannot now argue error on the basis of a theory
that was not presented at trial." *Commonwealth v. Mandeville,* 386
Mass. 393, 408 (1982). See *Commonwealth v. Ely,* 388 Mass. 69, 73
(1983); *Commonwealth v. Marchionda,* 385 Mass. 238, 242 (1982). In
the absence of testimony directed toward the defendant's ability to
premeditate deliberately, "[t]he injuries inflicted on the deceased [could
show] a conscious and fixed purpose to kill continuing for a length of time
and warranted a finding of murder with deliberately premeditated
malice aforethought." *Commonwealth v. Bonomi,* 335 Mass. 327, 356
(1957).

[8] The assistant district attorney conceded at trial that he had no
evidence that the defendant had taken a large quantity of amphetamines
in the period prior to December 15.

The Commonwealth offered no expert evidence to support its theory. Rather, it relied on statements in the defendant's Bridgewater State Hospital records and cross-examination of the experts. The experts, however, all rejected the Commonwealth's theory that the defendant's acts were solely the result of the voluntary ingestion of drugs. Further, the statements in the hospital records relied on by the Commonwealth were early diagnoses of impulsive or compulsive character disorder, an initial staff diagnosis of personality disorder, and the nurses' notes from the house of correction where the defendant was held after his arrest that he was "psychotic probably due to drug ingestion." These observations, however, were considerably weakened, if not ruled out, by the later Bridgewater report to the court from the medical director that the defendant was suffering from a mental disease (schizophrenia, paranoid type) and was not criminally responsible, and by other conflicting diagnoses.[9]

On the basis of the medical records, a case may be pieced together that the defendant's actions may have been solely the result of the voluntary use of drugs. However, that conclusion is difficult to reach in view of the Bridgewater report as a whole,[10] and the testimony at trial. See, e.g., note 4, *supra*. The Commonwealth failed to introduce medical testimony to support its theory. "It is fair to infer . . . that the Commonwealth was unsuccessful in a search for a medical expert who would support the Commonwealth's position . . . [I]n a case such as this . . . the Commonwealth runs the very real risk of reversal and the granting of a new trial if it chooses to rely on . . . the circumstantial evidence of sanity such as that adduced at this trial, rather than to introduce

---

[9] Another doctor, who did not testify but whose report was included in the Bridgewater State Hospital records, opined that "[t]he patient's history and his ability to describe in exquisite detail the events of the killing are . . . quite inconsistent with a toxic drug induced psychosis . . . ."

[10] The Bridgewater State Hospital records on which the Commonwealth relied were internally inconsistent, conflicting, and contradicted by the testimony at trial.

medical evidence of sanity." *Commonwealth* v. *Kostka,* 370 Mass. 516, 540 (1976) (Hennessey, C.J., dissenting in part). The evidence of the defendant's bizarre behavior when coupled with the Commonwealth's failure to support its claim with expert testimony has the effect of persuading us that the verdict was against the weight of the evidence.[11] Therefore, pursuant to our power under G. L. c. 278, § 33E, the judgment is reversed, the verdict set aside, and the case is remanded for a new trial.[12]

*So ordered.*

---

[11] The defendant's trial took place two months before our opinion in *Commonwealth* v. *Gould,* 380 Mass. 672 (1980). When the defendant is retried, should he timely request an instruction in accordance with *Gould,* such an instruction should be given. Although the rule announced in *Gould* is not to be applied retroactively, see *Commonwealth* v. *Breese,* 389 Mass. 540 (1983), we can think of no adverse impact that would result from permitting its application in retrials of cases that, at the time of the original trial, were not subject to *Gould.*

[12] Since we have concluded that the verdict is against the weight of the evidence, we need not reach the other issues raised by the defendant under G. L. c. 278, § 33E.