COMMONWEALTH *vs.* FRANCIS E. CULLEN.

Norfolk.    March 20, 1984. — October 18, 1984.

Present: PERRETTA, ROSE, & KASS, JJ.

*Insanity. Practice, Criminal,* Presumptions and burden of proof. *Evidence,* Sanity.

At the trial of indictments arising from the shooting of two policemen by the defendant, during which the defendant introduced expert testimony that he was not criminally responsible for his conduct, there was sufficient evidence to warrant a finding that the defendant was criminally responsible despite the Commonwealth's failure to offer any affirmative evidence of the defendant's sanity. [647-649] KASS, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on February 14, 1983.

The cases were heard by *Barton,* J.

*Maureen S. Duggan* for the defendant.

*Charles J. Hely,* Assistant District Attorney (*Dennis C. Mahoney,* Assistant District Attorney, with him) for the Commonwealth.

ROSE, J. The defendant, Cullen, appeals from his convictions in the Superior Court on two counts of assault with intent to murder, two counts of assault and battery by means of a dangerous weapon, and one count of unlawful carrying of a firearm. Cullen's sole defense at his jury-waived trial was lack of criminal responsibility as defined in *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967), i.e., that he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The issue on appeal is whether, as matter of law, the Commonwealth's evidence sufficed to support the trial judge's determination that Cullen was criminally responsible for the shootings. We determine that the evidence presented by the Commonwealth provided a legally sufficient basis for a finding of criminal responsibility. We cannot invade the province of the fact finder by substituting

the view of an appellate court on questions concerning the credibility of witnesses or the weight of evidence. The Superior Court's judgments are affirmed.

After midnight on February 5, 1983, while driving past 338 Central Avenue in Milton, Officer Paul Nolan heard a "loud bang" at the rear of his marked cruiser. He called the station for a back-up, pulled over, and stepped out of his car, asking Cullen, who was standing in the driveway of his home, if he had seen what had happened. Cullen had recently returned home from six or more hours spent drinking with a friend. Cullen did not respond to Nolan's inquiry. However, as Nolan came within twelve feet of him, repeating the question, Cullen drew a handgun, for which he had no license, from his waistband and began shooting at Nolan. The first bullet broke Nolan's left arm. Another caught him in the knee as he dove for cover near a car parked in the Cullen driveway. Yet another shot passed through Nolan's shirt and jacket without causing injury. Cullen then apparently disappeared behind his house, reemerging less than a minute later and firing upon Officer Charles Paris, who, by that time, was kneeling beside Nolan and radioing for help. Paris sustained a bullet wound in his back, which, as Paris testified, was turned toward Cullen at the time. Another shot damaged the portable radio on Nolan's hip. Turning, Paris fired four times in the direction of Cullen's muzzle flashes. Cullen fled.

Additional police then arrived and almost immediately received a radio report of an attempted break-in at 352 Central Avenue, the residence of a former lawyer of Cullen's. Officer Michael Breen found Cullen at the foot of the porch stairway at this address and, with service revolver drawn, ordered: "Frankie, give it up." Cullen then turned his back to Breen and placed his hands on the side of the house. As Breen approached, Cullen began to back away from the house. Believing him about to flee, Breen grabbed Cullen from behind, simultaneously restraining him and searching for the handgun. Both men fell to the ground. Officer Paris, arriving at the scene, handcuffed Cullen's wrists behind his back. Subsequently, Cullen "began to thrash about from left to right," which gyrations

soon revealed to the police a handgun under his back approximately at his beltline. Through expert testimony, the Commonwealth presented evidence of the gun's make and also of the fact that Cullen had reloaded it before being apprehended.

Cullen did not testify at trial, nor did he substantially contest these facts. Instead, through two psychiatrists, he offered evidence of his lack of criminal responsibility.[1] According to one psychiatrist, Cullen said the Milton police were "out to get him," that they, and other police departments from eastern Canada to New York City, had kept him under twenty-four hour surveillance for more than seven years. His phone was bugged, he averred. The police played "mind games" with him that "let him kill people," and caused "pins and needles attacks" in various parts of his body. The police interfered with his love life — which Cullen said potentially included five hundred women whom he knew to be attracted to him — by telling women that he was a sex pervert.[2] The psychiatrist testified that Cullen admitted that he had purchased the handgun on the street to protect himself from the police, and likewise threw a rock at the police cruiser and shot Nolan and Paris in self-defense. He told the psychiatrist that, while it would have been easy for him to kill the wounded Nolan, he refrained from doing so, intending only to "put him out of service." Cullen insisted that he ran to his lawyer's house only because "he was sure that the police would not kill him in front of . . . his attorney."

Both psychiatrists concluded, on the basis of slightly different diagnoses, that Cullen lacked criminal responsibility under the *McHoul* test, suggesting that the appropriate diagnostic labels for Cullen's condition might be "schizophrenia, paranoid type" and "erotomania," or a "paranoid delusional system." Confronted at trial with an EEG report from Bridgewater

---

[1] Cullen's conversations with the experts may be admitted insofar as they provide insight into his mental condition. *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 766 (1977).

[2] Cullen had previously been arrested several times for lewd behavior, including indecent exposure. He was on probation for armed robbery at the time of the shootings. His belief that the police were watching him may have a rational basis.

revealing minimal physical abnormalities, one expert changed her diagnosis to include the possibility of an organic psychosis.

Obviously, the trial judge rejected Cullen's insanity defense. Thus the question we must decide is whether, on the basis of all the evidence, viewed in a light most favorable to the prosecution, a rational trier of fact could have found Cullen to be criminally responsible beyond a reasonable doubt.[3] *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979); *Commonwealth* v. *Shelley*, 381 Mass. 340, 346 (1980); *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). A more extensive review of the evidence is available under G. L. c. 278, § 33E, but this court has no authority under that statute; moreover, the statute applies only in capital cases such as *Commonwealth* v. *Guiliana*, 390 Mass. 464 (1983).

Cullen does not suggest that the Commonwealth's evidence of criminal responsibility was insufficient at the close of the Commonwealth's case in chief. Until Cullen raised the insanity defense, the prosecution was entitled to rely on the "presumption of sanity," that is, the rule that, unless a criminal defendant asserts the insanity defense, the Commonwealth is not obliged affirmatively to prove sanity beyond a reasonable doubt as an element of its case. *Commonwealth* v. *Kostka*, 370 Mass. 516 (1976). Cullen argues instead that the Commonwealth's evidence deteriorated between the close of the Commonwealth's case and the close of all the evidence, and that therefore a required finding of not guilty by reason of insanity should have been entered at the close of all the evidence. *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 & n.1 (1976). He argues that following the expert psychiatric testimony that he was insane under *McHoul* standards the Commonwealth's case lacked sufficient evidence to satisfy its now increased burden of proving

---

[3] At the close of all the evidence defense counsel asked the trial judge to "find the defendant not guilty under the guidelines of *Commonwealth* v. *McHoul*" because the Commonwealth did not offer any evidence to rebut the "presumption" that Cullen lacked criminal responsibility at the time the act was committed. We accept this request as a motion for a required finding of not guilty under Mass.R.Crim.P. 25, as amended, 389 Mass. 1107 (1983) [added 25(c)]. In any case there is no doubt as to the basis on which the case was tried. See *Commonwealth* v. *Lunde*, 390 Mass. 42, 47 n.7 (1983).

sanity beyond a reasonable doubt. Cullen points to the Commonwealth's failure to offer expert or lay testimony on the sanity issue as an indication that this heightened burden of proof has not been satisfied. The Commonwealth did introduce affirmative evidence of sanity in *Commonwealth* v. *Lunde*, 390 Mass. 42 (1983), and *Commonwealth* v. *Werner*, 16 Mass. App. Ct. 686 (1983), in which guilty verdicts were sustained in spite of undisputed *psychiatric* diagnoses of insanity.

The trier of fact is not, of course, obliged to regard even unanimous expert opinion as conclusive on the issue to which it is addressed. *Commonwealth* v. *Lunde*, 390 Mass. at 47, and cases cited. Here, for example, the trial judge could have disbelieved the expert testimony or accorded it less weight either because the psychiatrists' diagnoses were not in complete agreement or because the judge believed the experts' interviews with Cullen to have been too brief or too remote in time from the shooting.[4] *Commonwealth* v. *Robinson*, 14 Mass. App. Ct. 591, 595-596 (1982).

Cullen attempts to distinguish the sufficiency of the sanity evidence in this case from the sanity evidence held sufficient in cases such as *Lunde*, and *Werner*, *supra*. He argues that evidence offered by the Commonwealth in *Lunde* showed Lunde's capacity to discriminate between victims, his calm and rational demeanor, and selection of a particular attorney following an incident in which he shot his brother-in-law more than a dozen times. Cullen points out that, in *Werner*, the Commonwealth offered evidence that after an unprovoked, fatal stabbing of a teenage girl in a Springfield bus terminal, Werner hid both his weapon and himself, exhibited a calm demeanor when captured, and made two detailed and coherent drafts of a confession in which he admitted to planning such a murder. In this case, Cullen suggests, no such demeanor or other evidence of sanity exists. We disagree.

The trial judge was entitled to draw inferences of sanity from evidence of Cullen's behavior at the time of the shooting.

---

[4] Further, Cullen had no prior history of psychiatric treatment except one referral to a residential treatment program, possibly for psychiatric reasons, some twenty-five years earlier. There was little evidence to corroborate the "facts" Cullen provided concerning his police paranoia upon which the expert opinions were based.

*Commonwealth* v. *Amaral,* 389 Mass. 184, 192 (1983). We must therefore determine whether the Commonwealth's case in chief contained facts legally sufficient to support a reasonable inference of sanity beyond a reasonable doubt.

Cullen's admission to one of the experts that for six or more hours before the shooting he had been drinking with a friend could support an inference that voluntary consumption of alcohol, not insanity, caused his violent behavior. Cullen's prior steady employment as a crane operator, a position he lost when the work was discontinued, and not because of erratic behavior, also supports an inference of criminal responsibility. Likewise, the facts that Cullen was carrying a gun, hurled a rock at the cruiser, waited for Nolan to come close to him before shooting, and returned from the rear of his house to fire upon Paris, support inferences of preparation and deliberation. Cullen's assertion that he could have killed Nolan, but refrained from doing so, his dash to his former attorney's home, and his eventual surrender to Officer Breen,[5] may all indicate to the trier of fact that Cullen could appreciate the criminality of his conduct. Further, while Cullen's post arrest "thrashing" could suggest the raging of a madman, it could also be attributed to his determination to reach the gun still beneath him.

The potential of a fact to support more than one reasonable inference does not warrant our substituting our judgment for that of the trier of fact, who was in the best position to evaluate the evidence he heard first hand.

*Judgments affirmed.*

KASS, J. (dissenting). If the prosecution's burden in this Commonwealth to establish criminal responsibility in the face of an insanity defense is to have any meaning, it was not met in this case. "[T]he Commonwealth runs the very real risk of reversal and the granting of a new trial if it chooses to rely on the presumption and the circumstantial evidence of sanity such as that adduced at this trial, rather than to introduce medical

---

[5] The trial judge asked one psychiatrist, "Then why does [Cullen] end up just before he is arrested at his lawyer's house putting himself in a passive position with his hands up against the wall if he thinks he hasn't done anything wrong?"

evidence of sanity." *Commonwealth* v. *Kostka*, 370 Mass. 516, 540 (1976) (Hennessey, C.J., dissenting in part). *Commonwealth* v. *Guiliana*, 390 Mass. 464, 470-471 (1983).

What are the facts of the case? Without provocation (except as may have been supplied by his own delusions), the defendant Cullen on February 5, 1983, attacked with a rock and then shot and wounded two Milton police officers. His defense is lack of criminal responsibility as defined in *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967), i.e., that "as a result of mental disease or defect he lack[ed] substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

Four Milton police officers described Cullen's assault. While on patrol, Officer Paul Nolan was startled by a "loud bang" at the rear of his cruiser. Nolan stopped to investigate and discovered the defendant Cullen standing in the driveway of the house in which Cullen lived. Cullen made no reply when Nolan asked "what was going on." When Nolan approached to within about twelve feet of Cullen, the latter suddenly and unexpectedly drew a Beretta automatic pistol and fired three shots, two of which wounded the police officer. The defendant then disappeared behind his house, but reappeared to shoot at Officer Paris, who had come to help Nolan. One shot wounded Paris in the shoulder, another hit Nolan's radio. Paris returned the fire and Cullen fled. Where he fled is of some significance to the Commonwealth's case; he fled a few houses up the street to the house of a lawyer he had previously employed.

A psychiatrist, Dr. Annaliese Alma Pontius, basing her testimony on an interview of the defendant, described the defendant as suffering from schizophrenia, paranoid type. So far as the cognitive prong of the *McHoul* test was concerned, Dr. Pontius gave it as her opinion that, on that February morning, the defendant lacked the capacity to appreciate the criminality of his conduct.

Dr. Pontius testified that Cullen thought he had been under twenty-four hour police surveillance every day for seven years; that wherever he went and whatever he did, the police would follow. Cullen would "test" this belief by leaving his house at

all hours of the morning and walking in various directions; inevitably, he sensed a police tail. This surveillance extended from "the entire east coast and into East Canada." Indeed, once when Cullen visited New York City, "15,000 police officers [had been placed] on call and alerted to his appearance there." The police had long been conducting "mind games" with Cullen in an attempt to control his mind "to let him kill people." They had placed bugs on his phone. They had even "turned the entire Boston female population against him [by] telling them he was a sex pervert so that he lost his many girl friends."[1]

On the night of the shooting, Cullen heard a car coming and threw a rock at it because he "couldn't take it any longer after seven years of constant surveillance." He knew the police "were getting to" him because he had been stricken with recent attacks of "pins and needles" caused by the police "mind games." He feared being killed by the police. These fears Dr. Pontius described as "incorrigibly delusional beliefs."

The defense also introduced a report by Dr. Martin Kelly, who, at the request of the Commonwealth, had conducted a psychiatric evaluation of Cullen. Based on an "[e]xtended psychiatric interview" on July 15, 1983, a review of Bridgewater records and a review of police reports, Dr. Kelly was of opinion that Cullen suffered "a paranoid delusional system in which . . . the Milton police were out to get him." Because it "is probable [that] at the time of the shooting he believed that the police were going to shoot him," Dr. Kelly concluded, along the volitional prong of the *McHoul* test, that Cullen "had a mental disease which resulted in the lack of substantial capacity to conform his conduct to the requirements of the law." Dr. Kelly's written report disclosed that Cullen had a history of "criminal and psychiatric difficulties," extending back to age fifteen when he spent a year in a residential treatment program.

---

[1] Cullen also told Dr. Pontius he had "batted" about 500 "girls" (a term Dr. Pontius understood to be a delusion that 500 women would be willing to go into a close relationship with Cullen). From this behavior, Dr. Pontius concluded that, in addition to the other mental illness, Cullen suffered "erotomania," "a type of psychosis," manifested by a delusion of grandeur that all women fall in love with him.

The Commonwealth offered no affirmative evidence of sanity. See *Commonwealth* v. *Kostka,* 370 Mass. at 539-540 (Hennessey, C.J., dissenting in part); *Commonwealth* v. *Walker,* 370 Mass. 548, 584-585, cert. denied, 429 U.S. 943 (1976) (Hennessey, C.J., dissenting in part); *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 765-766 (1977); *Commonwealth* v. *Brown,* 387 Mass. 220, 222 n.3 (1982); *Commonwealth* v. *Guiliana,* 390 Mass. at 470-471. As did the defendants in *Commonwealth* v. *Lunde,* 390 Mass. 42, 46 (1983), and *Commonwealth* v. *Werner,* 16 Mass. App. Ct. 686, 689 (1983), Cullen here does not claim entitlement to a required finding of not guilty as of the close of the Commonwealth's case-in-chief. Rather, the claim is that the Commonwealth's case deteriorated between the time the Commonwealth rested and the close of all the evidence, see *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 & n.1 (1976), and that, at the close of all the evidence, Cullen was entitled to a required finding of not guilty. Our inquiry, therefore, as in *Lunde* and *Werner,* is whether, on the basis of all the evidence, viewed in a light most favorable to the prosecution, any rational trier of fact could have found, beyond a reasonable doubt, that the defendant had substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law.[2]

In *Werner,* the attack was similarly unprovoked and bizarre. Similarly, two psychiatrists testified to the defendant's insanity. Relying on *Lunde,* we held that the jury could have rejected the opinions of the experts and could, on the basis of other circumstantial evidence, have found the defendant criminally responsible. The defendant in *Werner* (at 689 and 690) left the scene of the crime and hid himself and his knife. After arrest his demeanor at the police station was calm. He manifested comprehension of his rights and furnished the police with written confessions which displayed ability to differentiate relevant

---

[2] The *McHoul* test is phrased in the disjunctive, i.e., a person is not criminally responsible if he lacks substantial capacity as to either the cognitive or volitional component of the test. To establish that a person is criminally responsible, it is necessary to prove cognitive and volitional capacity.

from irrelevant facts. Similarly, in *Lunde* (at 48), the defendant at the time of the crime was oriented as to time, place, and persons. He discriminated among victims. He hid the murder weapon and ammunition after the crime. He was coherent and calm at the police station.

In the instant case the Commonwealth's evidence is palpably weaker. There was no evidence that Cullen had prepared for the crime. Compare *Lunde.* There was no economic motive. Compare *Commonwealth* v. *Kostka,* 370 Mass. at 518. There was no evidence of revenge and planning. Compare *Commonwealth* v. *Robinson,* 14 Mass. App. Ct. 591, 595 (1982), in which the factors of discrimination among victims and calm after arrest were also present.

The majority detect three indicia of sanity: (1) Cullen did not try to kill Officer Nolan but only meant to "put him out of service." From this the majority deduce that Cullen could distinguish between maiming and killing and also had the ability to refrain from killing. It is a nice distinction, but I am skeptical about it as a hallmark of sanity. I hesitate to bank on the sanity of a person who shoots only to wound rather than kill. The point is that the Commonwealth offered no evidence to suggest, much less prove beyond a reasonable doubt, that Cullen had substantial capacity to appreciate the obvious wrongfulness of putting police officers "out of service" by shooting at them. Nor did the Commonwealth offer any evidence to prove that Cullen had substantial capacity to refrain from trying to put police officers out of service. Cullen's acts were perfectly consistent with his delusional scheme that he must protect himself from the police or be killed or beaten by them. It is quaint to descry evidence of sanity from the circumstance that Cullen's delusional system did not necessarily require him to shoot to kill.

(2) The second indicator of sanity relied on by the majority is that when Officer Breen caught up with Cullen after the latter had fled and shouted, "Frankie, give it up," Cullen momentarily surrendered and did not shoot Breen. I think this characterization of Cullen's behavior stops short of the officer's full account of the arrest. Officer Breen testified that moments

after Cullen turned and put his hands on the house, as Officer Breen walked to within 10 feet of Cullen, the latter "started to back away from the wall." A struggle ensued which ended with Officer Paris assisting Officer Breen in placing handcuffs on Cullen, who was struggling on the ground. Both Officers Breen and Rogers described the handcuffed Cullen as "thrashing" around. It is, for me, not possible in these circumstances to conclude, as does the majority, that Cullen gave himself up, thereby evidencing his substantial appreciation of the wrongfulness of his actions. Nor can I accept that Cullen's momentary stance against the wall was sufficient to prove Cullen's substantial capacity to conform his conduct to the requirements of the law. The majority discounts the import of Officer Breen's having had his gun drawn when he ordered Cullen to "give it up." When Officer Paris had previously pointed his gun at Cullen, the latter had responded not by surrendering, but by shooting Paris. Lest it be said this demonstrates ability to discriminate because Cullen later refrained from shooting Officer Breen, it is well to bear in mind that when Cullen shot Officer Paris, Cullen did so from the relative safety of the vicinity of his house, but that when Cullen "refrained" from shooting Officer Breen, the latter had the drop on him.

(3) The third circumstance relied upon by the majority as evidence of Cullen's criminal responsibility is that when Cullen fled he ran to the porch of a nearby house which belonged to someone who was formerly his lawyer and that Cullen appeared to be trying to break into it. I recognize that a fact finder need not accept the contention of the defendant's expert that his flight to that location was consistent with his delusional scheme that he needed to protect himself from the police and that they would be afraid to kill him in front of his former lawyer. Even if, however, Cullen's flight to a lawyer's house could be construed as evidence of his substantial capacity to appreciate the wrongfulness of his actions, it presents no evidence that he was substantially able to conform his conduct to the requirements of the law when he tried to put the officers "out of service."

My difficulty with fitting the instant case into the *Lunde-Werner* mold is the extreme thinness of evidence adduced by the Commonwealth bearing on Cullen's criminal responsibility. Lay evidence by the police officers or others might have served, but the Commonwealth did not proffer any. *Commonwealth v. Amaral,* 389 Mass. 184, 192-193 (1983). I think the instant case is more like *Commonwealth* v. *Guiliana,* 390 Mass. at 469-471, in which the Supreme Judicial Court found the Commonwealth's case on sanity at the close of all the evidence so weak that, acting under G. L. c. 278, § 33E, it reversed a jury verdict as against the weight of the evidence. The test in this court, as the majority observe, is more narrow. We do not weigh the evidence — even if found by a judge rather than a jury. As indicated, the question to answer is whether a rational trier of fact could, beyond a reasonable doubt, have found Cullen criminally responsible in the *McHoul* sense. I do not think that finding can be made. The case for the defendant in this case is stronger than *Guiliana* in that one of the psychiatric opinions concluding that the defendant was criminally insane was prepared for the Commonwealth. As in *Guiliana,* there is a passing effort to suggest ingestion of a drug — here alcohol — but no evidence as to how much the defendant imbibed or that alcohol affected the defendant's conduct.