COMMONWEALTH vs. JANICE GOULET.

Essex. January 4, 1988. — May 9, 1988.

Present: WILKINS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Insanity. Evidence*, Expert opinion. *Practice, Criminal,* Required finding,
Trial jury-waived.

At the jury-waived trial of indictments for armed assault with intent to murder
and armed assault in a dwelling, the judge proceeded properly in choosing
on which of the expert witnesses and on what portions of their testimony
he would rely in making a determination of criminal responsibility, and
the judge's remark, in denying the defendant's motion for a required
finding of not guilty by reason of insanity, that all of the experts were
honest, forthright, and truthful when they gave their conflicting opinions,
did not require the conclusion that the Commonwealth had failed to
prove the defendant's criminal responsibility beyond a reasonable doubt,
but merely expressed the judge's belief that each opinion was honestly
held. [306-307]
On appeal from convictions of armed assault with intent to murder and armed
assault in a dwelling, the record of the defendant's jury-waived trial did
not support her claim that a substantial risk of a miscarriage of justice
had been created either by the judge's alleged application of an incorrect
standard for determining the defendant's criminal responsibility or by
his alleged failure to give due consideration to the nonexpert evidence
presented at trial, and the permissible inferences therefrom. [307-310]

INDICTMENTS found and returned in the Superior Court De-
partment on October 24, 1984.

The cases were heard by *Charles M. Grabau*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Carol A. Donovan*, Committee for Public Counsel Services,
for the defendant.

*Dyanne Klein*Polatin*, Assistant District Attorney, for the
Commonwealth.

ABRAMS, J. After a jury-waived trial in which the sole issue
was the defendant's criminal responsibility, the defendant,

Janice Goulet, was convicted of armed assault with intent to murder and armed assault in a dwelling. The defendant appeals her conviction alleging that the judge erred in denying her motion for a required finding of not guilty by reason of insanity and that the judge erred in the standard he used to determine criminal responsibility. We granted the defendant's application for direct appellate review. We affirm.

We summarize the evidence. On July 7, 1984, at approximately 1 P.M., the eighty-one year old victim was at home in Salem, in the company of her seventy-six year old friend. The victim's doorbell rang; she answered it to find a poorly dressed, unkempt woman, later identified as Janice Goulet, at the door. Goulet told the victim that she urgently needed to use the telephone. The victim allowed Goulet to enter the house and directed her downstairs to the telephone. When they got downstairs, Goulet withdrew a linoleum-type knife with a four-inch blade from her pocketbook and told the victim that she had to kill her so that she (Goulet) would be sent to jail. Goulet approached the victim wielding the knife; the victim pushed Goulet to the floor and landed on top of her. The victim's friend disarmed Goulet and telephoned the victim's son-in-law, who arrived shortly thereafter and summoned the police. During the approximately twenty minutes between the scuffle with the victim and the arrival of the police, Goulet remained silent.

When the police arrived, they found Goulet sitting silently in a chair. She did not react to being handcuffed and placed under arrest. The police took Goulet to the police station where she was read Miranda warnings. Goulet calmly responded to the booking questions, stating that she lived in a halfway house in Boston and that she intended to hurt the victim so that the authorities at the halfway house would understand that she should be put in jail in order to protect society. Goulet explained that she was living in the halfway house because she had murdered a baby. She further explained that she had been searching in Boston for another baby to kill, preferably one being taken care of by an elderly person, whom she could overpower. She had been unable to kill a baby in Boston because there were too many people in Boston, and that people

in Boston were "after her." Goulet explained that she had come to Salem to execute her plan because the town was less populous. She had been planning the crime for two weeks and had planned to surrender to the police after killing someone so she could go to jail and not to a mental institution. Goulet maintained a calm, controlled demeanor during questioning and during her overnight stay at the Salem police station.

The defendant did not contest the facts of the crime. The defendant sought to present an insanity defense through expert psychiatric testimony. Doctor Robert Moore, a defense witness, interviewed the defendant for one and one-half hours a little over a year after the crime.[1] Moore asked Goulet to recount the occurrences of July 7, 1984. Goulet responded that she had been a patient at the Erich Lindemann Mental Health Center (Lindemann Center) in Boston and that the personnel at the facility had been planning to discharge her to a halfway house or to some other less restrictive setting. Goulet was apprehensive about these plans because she thought she should remain in a hospital. Goulet left the Lindemann Center and travelled to Lynn where she thought she heard voices coming from a radio tower. Goulet claimed that the voices were talking about sexual subjects embarrassing to her. Goulet found a branch and began beating herself in an unsuccessful attempt to stop the voices. The defendant found herself in a housing project for the elderly in Salem, where she randomly picked a house in which to kill someone. Goulet told Moore that she had taken the linoleum knife from a hardware store with the purpose of killing someone. Goulet explained to Moore that she had determined to kill someone because she wanted someone else to suffer the way she had and because she felt that if someone else went to heaven she would no longer be in pain. Goulet stated explicitly that she did not want to spend the rest of her life in a mental institution.

---

[1] Moore stated that he also had received Goulet's psychiatric records from the Erich Lindemann Mental Health Center dating from 1978. Defense counsel also provided him with police reports, grand jury minutes, and reports from the Commonwealth's psychiatric witnesses.

From his review of Goulet's records, Moore noted a psychiatric history spanning nearly twenty years. In 1966, Goulet was admitted to the Massachusetts Mental Health Center where she stayed a short time until she was transferred to Danvers State Hospital for starting a fire. She was released in 1973, but she returned several months later after killing an infant. Goulet was found not guilty by reason of insanity and therefore she remained in Danvers until 1978, when she was transferred to the Lindemann Center. Goulet's commitment ended in 1980 or 1981, at which time Goulet became a voluntary patient. Goulet was repeatedly placed in halfway houses or in outpatient clinics, but she was returned to the Lindemann Center almost weekly because she continuously attempted to hurt herself. Moore noted a pattern of self-destructive behavior which repeated itself each time the question of her discharge was raised.

Based on his interview and review of Goulet's records, including results of several psychiatric tests performed on Goulet, Moore concluded that Goulet suffered from a "borderline personality disorder" and that she repeatedly manifested symptoms of schizophrenia, namely paranoia, delusions, and hallucinations.[2] Moore stated that prior to the incident of July 7, 1984, Goulet was suffering from a severe and major mental disorder — schizophrenia — and that on the date of the incident, she lacked the capacity to appreciate the nature and consequences of her acts and could not conform her conduct to the requirements of the law. In response to the court's inquiry, Moore opined that Goulet's flat affect and calmness after her assault on the victim were the result of Goulet's having reached her objective, and that her objective was the result of mental disease or defect.

---

[2] Moore defined schizophrenia as a psychosis which constitutes a major mental disorder and is manifested by a loss of contact with reality, delusions, and hallucinations, withdrawal from reality, loss of emotional response, and an inability to function socially. Moore defined "personality disorder" as ingrained character traits rather than mental illness. Moore defined "borderline personality disorder" as a clinical category in which to place patients whose symptoms fall between the diagnoses of psychosis or personality disorder.

The defendant also offered the testimony of Dr. David Swenson, a psychiatrist and director of the Salem Court Clinic. Swenson first met Goulet on September 27, 1973, when she was charged with the murder of an infant. Swenson examined her at that time for competency to stand trial. Swenson had subsequently examined Goulet approximately twenty times in connection with various commitment proceedings. Swenson met with the defendant on July 9, 1984, to examine her for competency and for criminal responsibility. Goulet told Swenson essentially the same story she had recounted to Moore regarding the events of July 7, 1984.

Swenson testified, based on his examination of the defendant and his review of the records, that Goulet suffered from schizophrenia, undifferentiated type.[3] He further concluded that Goulet lacked substantial capacity to conform her conduct to the requirements of the law and he questioned whether she had the capacity to appreciate the wrongfulness of her conduct.

In rebuttal, the Commonwealth presented the testimony of Dr. Robert Litman and Professor Brendan Maher. Litman, a psychiatrist with a specialty in schizophrenia, was the director of the inpatient psychiatric unit at the Lindemann Center. Litman had known Goulet since 1983 and had personally examined her at least five times prior to July, 1984. Litman was familiar with Goulet's records from 1978 through 1984.

Litman stated that he had examined Goulet on July 22, 1984, for competency and for criminal responsibility. The defendant told Litman that she was dissatisfied with the inpatient unit at the Lindemann Center and that she wanted to return to Danvers State Hospital or to the Massachusetts Correctional Institution at Framingham. The defendant stated that she was unhappy with the plans for her discharge to an after-care program. Goulet stated that she had been planning to kill someone for two months in order to have herself transferred.

---

[3] Swenson defined undifferentiated schizophrenia as a catchall category for patients who do not exhibit symptoms specific to one category of schizophrenia. Swenson noted that self-destructive behavior and homicidal ideation were consistent with such a diagnosis. Swenson further stated that Goulet's drop in IQ from 163 in 1966 to 92 in 1983, was consistent with schizophrenia.

Litman's review of Goulet's psychiatric records dating from 1978 indicated a multiplicity of diagnoses including chronic schizophrenia, undifferentiated and paranoid type schizo-affective disorder, personality disorder, borderline personality disorder, major depression, reactive depression, epilepsy, and a primitive character disorder. Litman stated that the multiplicity of diagnoses led him to believe that Goulet did not suffer from mental illness, but had feigned symptoms which had resulted in diagnostic confusion and contradiction. Litman stated that the patient's pattern of self-abusive acts around the time of her discharge dates indicated manipulative behavior.

Because of the multiplicity of diagnoses, Litman asked Brendan Maher, a professor of psychology at Harvard University, to conduct psychological testing of Goulet. Maher administered the Thematic Apperception Test (TAT)[4] and the Minnesota Multi-Phasic Inventory (MMPI).[5] Litman explained that the MMPI was very helpful in situations of confused diagnoses. Litman opined that the result of the MMPI indicated to him that Goulet was "faking bad," that is, exaggerating symptoms of mental illness. Litman explained that, where the patient exhibits only one symptom of schizophrenia,[6] the MMPI result indicating that a patient is faking would tend to confirm an opinion that the patient did not suffer from a major mental illness or schizophrenia.

In response to a question phrased in terms of *Commonwealth v. McHoul*, 352 Mass. 544 (1967), Litman stated that on July 7, 1984, Goulet was able to appreciate the wrongfulness of her conduct and to conform her behavior to the requirements of the law. Litman based his opinion on the defendant's account of the incident, his long-term observation of Goulet, and on the

---

[4] Litman described the TAT as a projective test that examines the thought processes of an individual for evidence of psychosis. The test is administered by showing patients pictures and asking them to tell stories about the pictures.

[5] Litman described the MMPI as a personality inventory that looks for evidence of major mental illness. The MMPI is composed of roughly 500 to 600 true or false questions the patient answers about himself or herself.

[6] In this case, Litman believed that Goulet exhibited only one symptom of schizophrenia, auditory hallucinations.

defendant's ability to control her behavior and to understand right and wrong in many different situations. Litman also stated that Goulet's two months' preparation for her crime was a significant factor in his opinion.

Maher stated that he performed the TAT and the MMPI on Goulet at Litman's request without having received any information regarding Goulet. Maher expressed his opinion that Goulet's score on the MMPI indicated that she was "faking bad," that she was manipulative and preferred to present herself as seriously mentally ill. Goulet's scores indicated diagnoses of psychopathic deviation, paranoia, neurotic anxiety, schizophrenia, and mania. Maher noted that these diagnoses were incompatible and that if the defendant actually suffered from the illnesses indicated by the test results, she would not have been able to take the test.[7]

Maher described the TAT as a test designed to identify a patient's attitudes, needs, motivations or perceptions of the outside world and that the test frequently detects disturbances in thinking processes. Goulet's test results indicated that she was emotionally immature and dependent, that she wished to reside in a protective environment and that she was indifferent to prospects of injury or death to others. Maher found no evidence of a thought disorder or psychosis, typical symptoms of schizophrenia. Maher concluded, from Goulet's test scores, from his observations, and from his review of her records, that the defendant suffered from an antisocial personality with some motive to appear mentally ill or from some serious personality disorder. Maher discerned no indication of major mental illness. Maher did not give an opinion in terms of the *McHoul* standard.

The defendant moved for a required finding of not guilty before the presentation of the psychiatric evidence and renewed her motion at the close of the evidence. The judge denied the

---

[7] Moore and Swenson, who examined the results of Goulet's tests, disagreed with Litman's and Maher's conclusions and stated that they did not believe that her results on the MMPI contradicted a diagnosis of schizophrenia.

motion. The judge found Goulet guilty of the crimes charged, stating that he was convinced that the Commonwealth had proven beyond a reasonable doubt that Goulet was criminally responsible for her acts.

1. *Denial of the motion for required finding of not guilty.* The defendant asserts, "Given competing opinions by credible experts on what was the sole issue in the case, a significant doubt must remain as to whether [the defendant] was criminally responsible for her actions." Thus, the defendant concludes she is "entitled to a required finding of not guilty."[8] We do not agree.

It is the prosecution's burden to prove the defendant's sanity beyond a reasonable doubt. *Commonwealth* v. *Sheehan*, 376 Mass. 765, 766 n.1 (1978). *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246 (1977). A defendant is not responsible for criminal actions if, at the time of the criminal conduct, as a result of mental disease or defect, he or she lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

It is undisputed that the defendant had a history of commitment for mental illnesses, and that the defendant's records indicated a multiplicity of diagnoses. The defendant asserts that the judge's remark that all the experts were honest and forthright and truthful when they rendered their conflicting opinions requires the conclusion that the Commonwealth did not meet its burden of proof beyond a reasonable doubt that Goulet was criminally responsible for her conduct on the day of the crime. We do not agree. As we read the record, the judge believed that each expert honestly held the opinion that the expert gave. However, the judge stated that he was "most impressed by the candidness of Litman and Maher" and that he

---

[8] Because the facts of the crimes were not contested, we read this argument to mean that the Commonwealth failed to prove the defendant was criminally responsible for her conduct, and not that the Commonwealth failed in its proof of facts of the crimes.

"put a great deal of weight on the way the MMPI was used by Litman." There is no record support for the defendant's suggestion that the judge found all the witnesses equally credible. Rather, the judge determined that, despite the defendant expert's honestly held opinions, he was persuaded by the Commonwealth's expert, and with the expert's use of the psychological test results. The judge, as trier of fact, could pick and choose on which witnesses and what portions of their testimony he would rely in making his determination of guilt. There was no error in denying the motion for a required finding of not guilty by reason of insanity.

2. *The standard for criminal responsibility.* At the time the judge found the defendant guilty, he made what he later characterized as "gratuitous" remarks because[9] "of the great effort [defense counsel] and the Assistant District Attorney had put into the case."[10] The defendant claims that the judge applied the wrong standard for determining the defendant's criminal responsibility, and that this error resulted in a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).[11]

At the conclusion of the trial, the judge stated, "This case is about a multiplicity of diagnoses. It's a mess. And what it really comes down to is it is up to me to decide whether this woman was suffering from major mental illness or a personality disorder on the date of the attack on [the victim]." The judge remarked, "In making my findings, I am convinced beyond a reasonable doubt that the Commonwealth has met its burden, that Ms. Goulet on the day in question committed the act, the assault on [the victim] and that she was criminally responsible, that she was not suffering from major mental illness. And that

---

[9] The judge characterized his earlier remarks at a postconviction hearing to correct the transcript.

[10] At oral argument, counsel for the defendant conceded that, had the judge said nothing more than his finding, this would not be an issue.

[11] The defendant made no objection at the time to the judge's remark. Nor did she suggest to the judge that he was employing an erroneous standard. We, therefore, consider this claim only to determine whether there exists a substantial risk that a miscarriage of justice occurred.

is my finding." The defendant contends that the judge incorrectly stated the standard for determining criminal responsibility in terms of the clinical diagnoses of Goulet presented by expert witnesses, and thus failed to make the proper legal and moral determination of the defendant's culpability.

As noted earlier, *supra* at 306, the judge placed great weight on the testimony of the Commonwealth's experts although he found the defendant's experts to be honest and forthright in the opinions they expressed.[12] Litman, on whose opinion the judge principally relied, testified in response to direct questioning in terms of the *McHoul* standards for determining criminal responsibility; thus, it is clear that the judge was not basing his opinion on testimony regarding the experts' clinical diagnoses.[13] Furthermore, the judge actively questioned all the ex-

---

[12] The judge stated: "Bearing in mind the burden of the Commonwealth, the burden the Commonwealth has, this case is not really about — when we talk about considering the experts, the so-called experts, this case is not really about credibility; because I think they were very honest and forthright and candid and truthful when the[y] rendered their respective opinions. From Doctors Moore to Swenson to Litman to Maher. But apart from the events that occurred when the incident took place in the home of [the victim], when we go beyond that, it is a question of where, — what weight do I put on the witnesses and what do I rely on more and what do I disregard?"

He further stated: "I think that as I read through the reports, the summaries and the reports from Lindemann, from Bay Cove and some of the other institutions, the test scores, the M.M.P.I., I was impressed most by, I think, the candidness of Litman and Maher; and I did put a great deal of weight on the way the M.M.P.I. was used by Litman.

"From the testimony I heard, the credible testimony I heard, it seems that there are very few diagnostic objective tools that psychiatrists and psychologists have today, despite the many advances; and this Minnesota Multi-Phasic Inventory Test is one that they do use and rely upon greatly. And as a trier of fact on this case, I was most impressed by that phase of the evidence."

[13] In response to the question phrased in *McHoul* terms, Litman stated: "In my opinion, I feel that she could appreciate the wrongfulness of her act, she was capable of conforming her behavior to the requirements of the law."

Both Moore and Swenson for the defendant opined that, as a result of a mental disease or disorder, the defendant lacked substantial capacity to appreciate the criminality or wrongfulness of her conduct and that she lacked the substantial capacity to conform her conduct to the requirements of the law.

perts in order to understand fully the bases for their opinions, an indication that he carefully evaluated all the evidence.

There also is no record support for the defendant's further contention that the judge's focus on the expert's evaluations of Goulet's mental condition resulted in his failure to give due consideration to other evidence presented at trial, particularly to Goulet's psychiatric history, see *Commonwealth* v. *Cullen*, 395 Mass. 225, 229 (1985); *Commonwealth* v. *Kostka*, 370 Mass. 516, 535-536 (1976), and to the implication of a lack of criminal responsibility that arises from the events of July 7, 1984, themselves. See *Commonwealth* v. *Guiliana*, 390 Mass. 464, 471 (1983); *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979); *Laliberty, supra* at 245. The trial judge clearly questioned the medical experts familiar with Goulet's history about her past behavior and about items contained in her medical records.[14] Furthermore, the judge remarked, "But apart from the events that occurred when the incident took place in the home of [the victim], when we go beyond that, it is a question of where, —what weight do I put on the witnesses and what do I rely on more and what do I disregard?" Essentially, the defendant's argument is that in light of all the evidence presented on the issue of Goulet's criminal responsibility, a required finding of not guilty by reason of insanity is required. The short answer is that, even in the absence of expert opinion from the Commonwealth, the trier of fact is not required to conclude that a defendant lacks criminal responsibility. See, e.g., *Cullen, supra*; *Commonwealth* v. *Louraine*, 390 Mass.

---

[14] For example, the judge questioned Litman about a case conference at the Lindemann Center that appeared in Goulet's records. The judge also questioned Litman about Goulet's history of outbursts and self-destructive behavior occurring around the times of her discharges and their correlation (or lack thereof) with changes in Goulet's medication.

29, 35 (1983); *Commonwealth* v. *Shelley*, 381 Mass. 340, 347 (1980); *Kostka, supra.*[15]

*Judgments affirmed.*

---

[15] In addition to the expert testimony, the Commonwealth presented considerable evidence to support the judge's conclusion that Goulet was criminally responsible, namely, evidence that she had a manipulative personality, she planned the crime two weeks or two months prior to its commission, she traveled to Salem to commit the crime, she chose an elderly victim, she took the knife to use for her crime, she fabricated a reason to gain entry to the victim's home, she was calm and controlled during her apprehension and after her arrest, and she was coherent and responsive in her interviews with the experts.