COMMONWEALTH *vs.* MARSHALL W. COX.

Middlesex. May 7, 1951. — July 3, 1951.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & WILLIAMS, JJ.

*Practice, Criminal,* Ordering verdict, New trial, Capital case, Examination as to mentality of defendant. *Evidence,* Of insanity; Opinion: expert; Presumptions and burden of proof.

The granting of a motion for a directed verdict of not guilty by reason of insanity was not required at the trial of an indictment for murder by the fact that psychiatrists of unquestionable qualifications, who had examined the defendant in the course of their official duties under G. L. (Ter. Ed.) c. 123, §§ 100A, 105, as amended, and were called as witnesses by the defendant, but not by the Commonwealth, gave uncontradicted opinion testimony to the effect that the defendant at the time of the murder was so lacking in mental capacity as not to be criminally responsible.

This court under G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, held that a verdict of guilty of murder in the first degree was against the weight of the evidence and that there should be a new trial where it was undisputed that, without there having been any domestic disharmony, the defendant had deliberately killed his wife in a revolting and barbaric manner and yet had professed to have done so in kindness to her and for her benefit, and the only issue in the case was his criminal responsibility and on that issue the only direct testimony was by two psychiatrists of unquestioned qualifications who had examined him in the course of their official duties under G. L. (Ter. Ed.) c. 123, §§ 100A, 105, as amended, and who were called by him, and was to the effect that at the time of the murder he was so lacking in mental capacity as not to be criminally responsible.

INDICTMENT, found and returned on March 3, 1948.

The case was tried in the Superior Court before *Hurley,* J.

*F. Juggins,* (*R. R. Clark* with him,) for the defendant.

*L. C. Sprague,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. On this indictment for the murder of his wife the defendant has been found guilty in the first degree and duly sentenced. The case is here upon his appeal with

a summary of the record, a transcript of the evidence, and an assignment of errors. G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341. The only error assigned is the denial of the defendant's motion for a directed verdict of not guilty of murder in the first degree. The defendant has never controverted the evidence for the prosecution, but contends that he should have been found not guilty by reason of insanity. Compare *Commonwealth* v. *Curtis,* 318 Mass. 584. Not only has he not controverted the evidence introduced by the Commonwealth, but his acceptance of it to the last horrible detail was, and is, the cornerstone of his defence.

That evidence consists principally of a signed confession, of admissions of the defendant made to the police, and of photographs of the deceased taken at the scene of the killing. The defendant and his wife, Helen H. Cox, who were married in 1933, had lived in a house near the center of Concord since 1941. There were no children. The defendant was born in 1889, and his wife was four years older. He had spent most of his life in this Commonwealth, and here he was graduated from high school and from college, and received a master's degree. He never achieved the economic success for which his education seemingly should have allowed him to hope. He did some teaching at first, but at the time of the events now the subject of our concern he was the owner and manager of the Stow Country Club in the town of that name, and in the winter time engaged in a small candy business.

On February 21, 1948, shortly after 10 A.M. the officer at the desk at the Concord police station received a telephone call from the defendant, who gave his name and address, and said, "I have some bad news for you. I have just killed my wife. Will the police please come down?" In a few minutes a police officer arrived at the house, where he found the defendant in one room and his wife in a moribund condition lying in a pool of blood on the floor of another. The defendant's first words were, "Officer, I have just done a most terrible thing. I just killed my wife." As the

police officer, who had observed that Mrs. Cox was still alive, went to a telephone, the defendant said, "It's useless to get a doctor because I've done a very thorough job. A doctor could do her no good." When the medical examiner, who was a physician known to the defendant, arrived, the defendant said that there was no sense in the doctor being there because he had really "fixed her."

The defendant was in no way hesitant about telling what had happened. While his wife was playing a composition of Mozart on the piano, he approached from behind and with great force struck her on the head with a common type of claw hammer. When she fell forward, he lifted her to the floor where he struck her a number of additional blows on the head with the same instrument. As these did not bring about immediate death, he procured an ice pick with which he penetrated her left eye and left ear, and punctured her left breast three times. Still not achieving her death, he brought into use a wire which he placed around her neck in an attempt at strangulation. He then washed off the hammer and ice pick with a dish towel.

Death occurred after the police and medical examiner arrived. The cause of death was multiple compound fractures of the skull. Multiple stab wounds of the chest and heart were a contributory cause.

After the various attacks, but prior to calling the police, the defendant telephoned his stockbrokers in Boston and gave instructions to sell all the securities in his account and not to call him back. He also telephoned his brother. The defendant's explanation of his action, given to the police and later to psychiatrists, was that he had become discouraged because of prospective heavy expense of repairing the country club roof, which had fallen in because of an accumulation of snow, and that he wished to spare his wife the sufferings of financial adversity. She had recently said that she dreaded growing old. He thought of killing himself but felt that would have left the burden on her. In 1930 he had unsuccessfully tried suicide by poison. He conceived the idea of killing her during the previous night

when he was in bed. It occurred to him that he might put her out of this world without her ever knowing what happened. "It seemed like a kindness." There was no domestic disagreement, no marital unhappiness. Following the assaults, the defendant exhibited no remorse, and his outward manner was calm and composed. He then experienced a sensation of great relief, and "quite a few times he repeated that he thought he did a good job, that when he killed his wife that would be the end of her, and that the State would take his life, and that they would both meet in the next world." He expressed the view that she was better off.

After indictment and plea of not guilty the defendant was examined by two psychiatrists pursuant to the so called Briggs law. G. L. (Ter. Ed.) c. 123, § 100A, as amended by St. 1941, c. 194, § 11. Upon their recommendation he was committed for observation to Bridgewater State Hospital on March 23, 1948. G. L. (Ter. Ed.) c. 123, § 100. On April 23, 1948, he was committed to that hospital until further order of the court following a warrant to remove signed by Dr. Stearns, medical director of the hospital (G. L. [Ter. Ed.] c. 125, § 48), and by Dr. Perkins, the commissioner of mental health, and a report by Dr. Stearns, which concluded, "it is our opinion that he is insane and in need of care in a hospital for mental disease. Diagnosis: Manic Depressive Insanity; Depressed Phase." On February 8, 1950, Dr. Stearns reported that the defendant had recovered, and he was returned for trial. G. L. (Ter. Ed.) c. 123, § 105, as appearing in St. 1936, c. 130, as amended by St. 1945, c. 50. *Commonwealth* v. *Zelenski,* 287 Mass. 125, 126.

At the trial, which was held on April 24, 25, and 26, 1950, the Commonwealth did not call these doctors as witnesses. The defendant, however, as his only witnesses, called Dr. Berk, one of the psychiatrists appointed under § 100A, as amended, and Dr. Stearns, who at some time previous to his connection with Bridgewater State Hospital had been commissioner of correction. These medical witnesses were of unquestioned qualifications. See *Com-*

monwealth v. Devereaux, 257 Mass. 391, 396. They testified that in their opinion the defendant was "insane" on February 21, 1948. We consider the case on the footing that by this they meant a lack of mental capacity which would excuse the defendant from legal responsibility for crime, and that they did not intend to express an academic medical viewpoint without relevancy in a criminal case. Commonwealth v. Gordon, 307 Mass. 155, 157. See Commonwealth v. McCann, 325 Mass. 510, 515, and cases cited.

Apart from any issue of legal responsibility, there was evidence warranting a finding that the murder was committed with deliberately premeditated malice aforethought. Commonwealth v. Tucker, 189 Mass. 457, 486–496. There was also evidence warranting a finding that it was a murder committed with extreme atrocity or cruelty. Commonwealth v. Bartolini, 299 Mass. 503, 516. Commonwealth v. Sheppard, 313 Mass. 590, 594. Commonwealth v. McGarty, 323 Mass. 435, 440. While the Commonwealth had the burden of proving the defendant's mental responsibility for the crime, "the fact that a great majority of men are sane, and the probability that any particular man is sane, may be deemed by a jury to outweigh, in evidential value, testimony that he is insane. . . . [I]t is not . . . the presumption of sanity that may be weighed as evidence, but rather the rational probability on which the presumption rests." Commonwealth v. Clark, 292 Mass. 409, 415.

The defendant's theory is that because Dr. Stearns and Dr. Berk examined the defendant in the discharge of their respective duties to the Commonwealth, they should have been witnesses for the prosecution; and that their uncontradicted testimony, even as witnesses for the defendant, as matter of law required a directed verdict of not guilty by reason of insanity. These contentions, which go to the length of calling improper the cross-examination of these witnesses by the district attorney for the purpose of weakening the effect to be given their opinion, cannot be sustained. We do not believe that the Legislature intended any such results in enacting the statutes here pertinent pro-

viding for the mental examination of persons held for trial. The reports did not undertake to state that the defendant was not criminally responsible on the day of the killing. Had they done so, the defendant doubtless would not have been brought to trial. See *Commonwealth* v. *Devereaux*, 257 Mass. 391, 396–397. That Dr. Berk examined the defendant and made reports under § 100A, as amended, did not bind the Commonwealth to whatever views he might express upon the witness stand, if he should be called by the defendant and even if his testimony should pass uncontradicted. "It [§ 100A] is an important statutory provision, but its design is to forward the administration of public justice, not to put into the hands of those charged with crime a new weapon of defence." *Commonwealth* v. *Vallarelli*, 273 Mass. 240, 249. *Commonwealth* v. *Belenski*, 276 Mass. 35, 43. The same is true of the examination and the reports made by Dr. Stearns as medical director of Bridgewater State Hospital under § 105, as amended.

The defendant filed a motion for a new trial on the grounds that the verdict was against the law, the evidence, and the weight of the evidence. The denial of this motion was not assigned as an error. And no error of law appears in its denial. *Commonwealth* v. *Noxon*, 319 Mass. 495, 550.

Although we perceive no error of law in the conduct of the trial, we have another function. General Laws (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, provides: "In a capital case the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence, and the court may order a new trial if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require." This statute consigns the facts as well as the law to our consideration, gives us the power and the duty exercised by a trial judge upon a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. *Commonwealth* v. *Gricus*, 317 Mass. 403, 406–407.

We discharge this function at a disadvantage which is indeed very great, for we have not had the benefit of observing and hearing the witnesses. Yet in this solemn hour for the defendant we must discharge the function subject to this handicap or not at all.

Our outline of the evidence discloses an extraordinary affair. It portrays the sudden destruction, while in apparent good health, of one member of a harmonious and cultured household by the only other member, in a series of acts paradoxically done, it is confessed, solely in kindness to benefit the victim, yet revoltingly achieved in the grossest barbarity with the crudest of weapons. The mere statement of these acts and of the purported motive at once evokes curiosity as to the state of mind of their perpetrator. The only issue in the case was the criminal responsibility of the defendant. The only direct testimony on this issue came from two psychiatrists who had examined the defendant in the course of their official duties, one under the so called Briggs law, and the other as medical director of the institution to which the defendant was committed. Each psychiatrist testified to his opinion, which we have accepted as an expression of a belief that the defendant was not criminally responsible at the time of the killing. There was no medical testimony that he was responsible. The fact that most men are sane, and a rational probability that the defendant, too, may have been sane on February 21, 1948, notwithstanding what he then did and later said about it, seem to us inadequate reasons upon which to disregard this unanimous medical opinion that he was not. In the opinion of a majority of the court, the verdict was against the weight of the evidence, and there should be a new trial.

*Judgment reversed.*