COMMONWEALTH *vs.* JOHN F. KAPPLER, JR.

Middlesex. May 5, 1993. - December 15, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Homicide. Insanity. Evidence*, Insanity, Presumptions and burden of proof,
Expert opinion. *Witness*, Expert. *Practice, Criminal*, Required finding,
Instructions to jury, New trial. *Due Process of Law*, Presumption.

Evidence at a murder trial was sufficient for the judge to submit to the
jury the question of the defendant's criminal responsibility, and the evi-
dence supported the jury's verdict of guilty. [583-584] O'CONNOR, J.,
dissenting.

At a murder trial, there was no error in the admission of expert psychiatric
rebuttal testimony as to the witnesses' observations of the defendant
and their psychiatric explanations for the defendant's actions using the
standard of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547
(1967), even where the experts did not give an opinion whether the
defendant was or was not criminally responsible. [584-585]

The judge at a murder trial correctly instructed the jury on the issue of
criminal responsibility, including the presumption of sanity. [585-587]
ABRAMS, J., concurring, expressed the view that, if *Commonwealth* v.
*Kostka*, 370 Mass. 616 (1976), were to be reconsidered, she would
adopt the position of the increasing majority of States, which places the
burden of proving lack of criminal responsibility on the defendant.
[601-602]

The judge at a murder trial did not abuse his discretion or commit an
error of law in denying the defendant's motion for a new trial pursuant
to Mass. R. Crim. P. 25 (b) (2). [587-588]

INDICTMENTS found and returned in the Superior Court
Department on May 31, 1990.

The cases were tried before *Robert A. Barton*, J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Jonathan Shapiro* for the defendant.

*David R. Marks,* Assistant District Attorney (*Marcia E. Jackson* with him) for the Commonwealth.

ABRAMS, J. Convicted of murder in the second degree, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, the defendant, John F. Kappler, Jr., appeals. The trial focused on the issue of criminal responsibility. After the verdicts, the defendant moved to set aside the verdicts and for required findings of not guilty or, in the alternative, for a new trial. The motions were denied. The defendant alleges error in the denial of his motion for required findings of not guilty, in the allowance of the Commonwealth's rebuttal testimony, in the jury instructions, and in the denial of his motion for a new trial. We transferred this case from the Appeals Court on our own motion. We affirm.

We summarize the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 815 (1980). The defendant, a sixty year old retired anesthesiologist from California, and his wife were visiting their daughter in Medford. On the morning of April 14, 1990, the defendant was to leave Boston and drive to New York City to meet his son. The wife was to fly home to California that day. The defendant awoke at 6 A.M. and spent time packing the car, rearranging things. He had a brief conversation about California with an elderly man who happened to walk by the automobile. The defendant's daughter's fiancé arrived. A friend of his daughter drew him a map of the route to New York. The defendant then ate breakfast with his wife, his daughter, her fiancé, and her friend. The defendant said that he had to get going because he wanted to be on his way by 10 A.M. No one noticed anything unusual about the defendant.

The defendant drove through a red light on Alewife Brook Parkway. He was staring straight ahead. He then drove his car onto the footpath adjacent to Alewife Brook Parkway and proceeded to strike two individuals, killing one. The defendant followed the contours of the path, did not sound his horn, did not swerve, and did not stop. After striking the sec-

ond victim, as he drove away he accelerated his automobile and returned to the road. The defendant left his automobile behind a house in a driveway. The automobile was not visible from the street.

According to the defendant, he wandered around the vicinity. He also said that he returned to the area of the incident. Further, he called his daughter's home and left a message saying, "Oh, I thought I might catch you there. Maybe you could pick me up." He then took a bus to New York City and checked into a hotel. The next day he called his wife and told her he thought he had killed someone. She told him to go to the Payne-Whitney Psychiatric Clinic, a part of New York Hospital. The defendant did so. The defendant's son met him at the emergency room there, where, according to the defendant's son, the defendant appeared confused. According to the son, the defendant attacked him and attempted to strangle him.

Prior to trial, the defendant notified the Commonwealth that, at trial, he would claim that he lacked criminal responsibility. The judge ordered the defendant to be evaluated for his competency and his criminal responsibility. Dr. Prudence Baxter, who conducted the evaluation, concluded that the defendant was competent to stand trial, but determined that he was suffering the symptoms of mental illness and therefore recommended further evaluation in order to determine whether he was criminally responsible.

The defendant, through his wife and medical history, presented evidence of his long but sporadic history of mental illness and auditory hallucinations.[1] One defense expert, Dr. Martin Kelly, testified that the defendant suffered from atyp-

---

[1]The judge carefully limited the evidence of the defendant's statements and treatment history. Repeatedly he told the jurors that that evidence was admitted not for its truth, but as it related to the issue of the defendant's criminal responsibility and as a basis for the experts' opinions on his criminal responsibility. The defendant in his brief relies on the defendant's statements, made as part of his medical history and examinations, as if they were admitted for their full probative value. The judge's careful rulings preclude the use of that evidence for its probative value.

ical psychosis and, although able to appreciate the wrongfulness of his conduct, was unable to conform his conduct to the requirements of the law. Another expert, Dr. Ronald Ebert, testified that, in his opinion, the defendant was unable either to appreciate the wrongfulness of his conduct or to conform his conduct to the law. He diagnosed the defendant as suffering either from atypical psychosis with paranoid features or schizo-affective disorder.

Two additional experts who testified for the defense did not state opinions as to whether the defendant was criminally responsible. Dr. Robert Aranow testified as an expert in psychiatry. He stated that, in his opinion, the defendant suffered from a mental disease he called atypical psychosis on the date of the incident. Dr. Aranow characterized the defendant's psychosis as "extremely" unusual. He also acknowledged that the defendant made a number of inconsistent and contradictory statements about the events occurring on the date of the incident. Then Dr. Lloyd Price testified that on the date of the incident, the defendant was suffering from psychosis. He categorized the defendant's mental disease as atypical psychosis with affective features. Neither Dr. Aranow nor Dr. Price expressed an opinion whether the defendant was able to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

The Commonwealth called three witnesses in rebuttal. None of these witnesses stated a conclusion as to whether the defendant was able to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, although each offered testimony that supported the Commonwealth's position that the defendant was sane as part of the testimony.

1. *The motion for required findings of not guilty.* The defendant moved for required findings of not guilty, both at the close of the Commonwealth's case[2] and at the close of all the

---

[2]The defendant moved for required findings of not guilty, arguing that the Commonwealth had failed to prove intent. His argument ignores the

evidence. The motions were denied. The defendant appeals, claiming that there was insufficient evidence to support jury verdicts finding him sane beyond a reasonable doubt.

In reviewing the denial of a motion for a required finding, we "must determine whether the Commonwealth's evidence, 'considered in its light most favorable to the Commonwealth, was sufficient to permit the jury to infer the existence of [criminal responsibility].' " *Commonwealth* v. *Shelley*, 381 Mass. 340, 346 (1980). In addition, "the evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [sanity] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).

The defendant stipulated to the fact that he drove the car that struck two victims, killing one of them. In its case in chief, the Commonwealth presented evidence linking the defendant's car to the injuries and showing that one victim died as a result of injuries received when he was struck by the car. There was no error in denying the motion for a required finding of not guilty at the close of the Commonwealth's case.

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul, supra* at 546-547. When a defendant claims that he is not criminally responsible for his acts, the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant is sane. *Commonwealth* v. *Kostka*,

---

evidence and the reasonable inferences that the jurors could draw from that evidence. A required finding of not guilty at the close of the Commonwealth's case is inappropriate where, as here, there is no dispute on the facts of the crime and the defense is that the defendant is not criminally responsible. Sanity is not an element of the crime. See *Walker* v. *Buttersworth*, 599 F.2d 1074, 1078 (1st Cir. 1978), cert. denied, 444 U.S. 937 (1979); *Commonwealth* v. *Kostka*, 370 Mass. 516, 532 (1976).

370 Mass. 516, 526 (1976). The defendant acknowledges that the jury is not required to accept the uncontroverted testimony of experts. *Commonwealth* v. *Shelley, supra* at 347. We have also held that the Commonwealth need not present expert evidence to prove that a defendant is sane beyond a reasonable doubt, *Commonwealth* v. *Brennan,* 399 Mass. 358, 364 (1987), and that the fact finder may infer sanity from the "facts underlying the crime and evidence of [the defendant's] actions before and after the crime." *Commonwealth* v. *Cullen,* 395 Mass. 225, 229 (1985).

The defendant argues that the events before the incident, the incident itself, and his actions afterwards indicate that he was not sane when he committed the crime. The defendant then asserts that he could not have formed the intent to do the act until just before he committed the crime because he did not know the victims or the area. He also states that there is no rational explanation for the commission of the crime. Finally, the defendant claims that his departure from the scene, abandonment of the automobile, and flight to New York City indicate that he did not appreciate the nature of his conduct. He points to his son's description of the defendant's disheveled appearance and the defendant's attempt to strangle his son as further evidence that the defendant was acting under the compulsion of psychosis.[3] We do not agree. The question of what inferences to draw from this evidence is for the jurors, not the trial judge and not this court.[4]

---

[3]The defendant also asserts that the Commonwealth did not prove a motive for the crime. The Commonwealth need not prove motive. See, e.g., *Commonwealth* v. *Borodine,* 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Bonomi,* 335 Mass. 327, 355 (1957).

[4]The Commonwealth argues that the inferences to be drawn from the same evidence permit the jurors to conclude that the defendant was criminally responsible. According to the Commonwealth, the jurors could view the flight to New York as showing consciousness of guilt. Alternatively, the jurors could view the trip to New York as indicating the defendant was in touch with reality because he followed his plan to go to New York that day. Further, the defendant telephoned his wife and followed her instructions to admit himself to the Payne-Whitney Clinic of New York Hospital. The inferences to be drawn from the evidence were for the jury, not this court.

After the defendant presented his case, the Commonwealth produced experts to rebut the testimony of the defendant's experts. One of the court-appointed experts, Dr. Baxter, found no evidence of psychosis or thought disorder when she examined the defendant. The defendant told her that he had heard voices in the past, telling him to act. She testified that the defendant was able to resist these voices at times. She stated that the defendant's description of his self-described "manic" episodes was "not typical of what people describe who have manic episodes, nor was it typical of the way that psychiatrists would diagnose a manic episode." She explained that the defendant's ability to function as an anesthesiologist during his past episodes, among other things, was highly unusual. Although she did conclude that the defendant suffered from mental illness, this conclusion was not based on his presentation before her but rather on the defendant's history of hospitalization and description of psychiatric difficulties since 1953. She did consider that he might have been malingering, but did not reach any conclusion about it.

Dr. James Carpenter also testified in rebuttal. He stated that two things about the defendant's description of the voices he heard struck him as unusual. "One was there was an inconsistency in the number of voices that he talked about. And also the nature of the hallucinations was very different from anything I had ever read about or heard about or encountered." Dr. Carpenter testified that, when confronted with the inconsistency, the defendant "became rather pale and shaken." Dr. Carpenter also discussed the results of various tests that he had given the defendant. He said that he could find no indications of psychosis in the defendant's results, and that the defendant's code on the Minnesota Multiphasic Personality Inventory test (MMPI-2)[5] "was not the

---

[5]Dr. Carpenter testified that this test "is probably the most widely used and most widely researched objective test of personality." The purpose of the Minnesota Multiphasic Personality Inventory test (MMPI) is "to give you a description of the person's personality functioning, the presence or absence of psychiatric symptoms, and it can tell you something about the

description of somebody who was actively psychotic." Dr. Carpenter said that "the character descriptions that [he] got . . . from the test material . . . had more to do with an anti-social personality and a passive dependent personality." Dr. Carpenter explained that the code indicated that the defend-ant "was a person who had a tendency to over-control his hostility." He said that the defendant's score on one content scale, the one representing antisocial practices, was elevated.[6] Dr. Carpenter then stated that "that's one of the most fre-quently occurring codes among people who are incarcerated in prisons." He then stated that the results of the tests he had administered to the defendant did not indicate that the defendant was psychotic, although they could indicate that the defendant was vulnerable to psychosis.

The last Commonwealth rebuttal witness was Dr. Freder-ick Kelso. He also did not reach a conclusion as to whether the defendant was criminally responsible under the *McHoul* test. He proffered three explanations, or models, for the de-fendant's conduct. First, Dr. Kelso explained that the defend-ant may have been suffering from a major mental illness at the time he evaluated him. Thus, the descriptions of his thoughts and feelings would be largely accurate. Dr. Kelso rejected this model because of the atypical nature of the de-fendant's descriptions. The defendant's "disorder seemed to come upon him very rapidly. It was unusual in its na-ture. . . . [H]e didn't seem to be grossly mentally ill at the time that the psychological testing was conducted." Dr. Kelso also found noteworthy the fact that the defendant seemed to experience the voices continuously, while most people suffering from a psychosis find that the voices dimin-ish when they engage in activity. In addition, the defendant

person's response set. That is to say the way in which they approach the testing, whether they were being truthful, whether they had certain kinds of tendencies which influenced the results."

[6]Dr. Carpenter testified that the scale concerning antisocial practices "is made up of items that refer to problems with authority, problems with family, problems with alienation from other people, I believe, and aliena-tion from one's self."

described the voices as coming from inside his head, whereas most people who hear voices say the voices come from outside them. The defendant's description of more than one voice was also atypical. Finally, Dr. Kelso also suggested that both the defendant's attempt to interpret the voices and his ability to disobey the voices were inconsistent with this model. Dr. Kelso stated "to the extent that sometimes he found himself interpreting the instructions that the voices gave him, making sense out of them in his own mind or extending them, then maybe he was actively processing the information that was going on inside his head and considering other alternative ways of behaving."

In the next model Dr. Kelso discussed, he explained that he was concerned with the accuracy of the defendant's "retrospective reports of his thoughts and feelings and behavior around the relevant time period." Although Dr. Kelso often thought the defendant was being sincere, things developed in their interviews that made him question whether the defendant's reports were completely accurate. Dr. Kelso noted that the defendant would say "I think" when he was describing much of what happened. He stated that this gave him a picture of "someone who, at some times, wasn't entirely sure exactly what had happened and, in reconstructing it, said things consistent with that." Dr. Kelso also questioned whether the defendant was exaggerating his experience of his disorder, citing two examples that he felt indicated that the defendant was intentionally misrepresenting his experience. The defendant sexually propositioned Dr. Kelso and Dr. Kelso said the defendant then stated, "My classification here suggests that if you report this to the court . . . that it probably won't hurt my case." Dr. Kelso stated that most people experiencing a psychotic episode do not draw attention to their unusual behavior. This made Dr. Kelso wonder if the defendant "had decided to proposition me, thinking that I might draw conclusions about him on account of that." In evaluating the defendant, Dr. Kelso also considered the defendant's statement that it was going to be very hard for him at the trial. When Dr. Kelso pursued this statement, the de-

fendant stated, "They always desire remorse. It will be kind of hard to manufacture."

The third model Dr. Kelso offered as an explanation for the defendant's behavior was that the defendant suffered from a character or personality disorder.[7] Dr. Kelso differentiated between psychosis and character disorder by saying that "[i]n a psychotic condition, a person is out of touch with reality. . . . Someone who has a character disorder . . . has got their habitual ways of looking at the world, but they're not really out of touch with reality." Dr. Kelso stated that the defendant did not fit precisely into any category of character disorder, but had symptoms of a number of them. Under this model, "if you assume that he's got this character disorder and he's just got this character disorder and he's not psychotic, he's not out of touch with reality, then you consider the extent to which his feelings of inadequacy and deficiency and exposure to violent ways of solving intra-personal problems, if that had anything to do with his behavior in the relevant time period." Dr. Kelso stated that the defendant had antisocial and narcissistic traits, had exhibited some obsessive-compulsive and juvenile delinquent behavior, and had grown up in a family where violence was often used to solve problems. Dr. Kelso stated that the character disorder model explained part of the information he had received from the defendant, but not all of it.

Contrary to the dissent, the question whether to believe the experts is for the jurors, not judges. "[J]urors are the ultimate judges of expert testimony and . . . such testimony is not conclusive . . . ." *Commonwealth* v. *Kostka, supra* at 536. Credibility is not for this court. The defendant asks that we reconsider our decision in *Commonwealth* v. *Kostka, supra,* which permits the jurors to consider as evidence the presumption of sanity. We decline to do so because there was expert testimony, which, if believed by the jurors, supported

---

[7]The defendant's expert, Dr. Kelly, testified that, generally, a diagnosis of "antisocial personality" would not satisfy the requirements of *McHoul.*

the jurors' conclusion that the defendant was criminally responsible.

Apart from the evidence of the crime and the inferences to be drawn therefrom, see *supra* at 579 and note 4, two of the Commonwealth's experts testified that there was evidence indicating that the defendant had a personality or character disorder (a condition that does not meet the *McHoul* standard for lacking criminal responsibility). See note 7, *supra.* Dr. Carpenter stated that the records of the defendant's psychological test scores were consistent with a personality or character disorder. See *supra* at 581. Dr. Kelso's third model also explained the defendant's behavior could result from a character or personality disorder. See *supra* at 583. One of the experts also opined that the unusual symptoms could be due to malingering. See *supra.* All the experts noted that the defendant's symptoms were "unusual" or "atypical" and all noted inconsistencies in his descriptions of symptoms and events.

The jurors were free to believe such portions of the experts' testimony as they deemed credible and reject the rest. "The law should not and does not give the opinions of experts on either side of the issue the benefit of conclusiveness, even if there are no contrary opinions introduced at trial." *Commonwealth* v. *Kostka, supra* at 536, quoting *Commonwealth* v. *Smith*, 357 Mass. 168, 178 (1970). The jurors could consider the inconsistencies with the defendant's statements to the experts in determining whether the defendant was criminally responsible. The jurors could conclude that the defendant, who had medical training in psychiatry, was attempting to manipulate the doctors with his description of his "atypical" symptoms in an effort to escape responsibility for his conduct. In sum, there was evidence which, if believed, supported the jurors' conclusion that the defendant was criminally responsible.

2. *The admission of expert testimony where the experts did not reach an opinion as to criminal responsibility.* The defendant argues that it was error for the judge to admit the testimony of Drs. Baxter, Carpenter, and Kelso because none

had been able to draw a conclusion as to the defendant's criminal responsibility under the *McHoul* standard.[8] For the admission of expert testimony "[a]ll that is necessary is that the subject matter be one about which special knowledge beyond that possessed by the ordinary [juror] will aid the jury in their deliberations, and that a person possessing such knowledge give opinions pertinent to the issues of the case founded upon facts which either are conceded or could warrantably be found upon other evidence." *Commonwealth* v. *Allen*, 395 Mass. 448, 458 (1985). The experts testified as to their observations of the defendant and psychiatric explanations for the defendant's actions. The experts simply were not able to opine whether the defendant satisfied the *McHoul* test for criminal responsibility. There was no error. Each expert offered theories under which the defendant would be criminally responsible. They also presented theories to support the inference that the defendant was not criminally responsible. Each expert used the *McHoul* standard in trying to determine the defendant's responsibility. The experts need do no more. See *Commonwealth* v. *Monico*, 396 Mass. 793, 800 (1986). See also *Commonwealth* v. *DeSalvo*, 353 Mass. 476, 483 n.5 (1968). Psychiatric "conclusions are less important than details on which they are based." See A.S. Goldstein, The Insanity Defense (1967). "Although experts must weigh all factors much as a jury must do, their testimony must not, in effect, usurp the jury's functions." *Commonwealth* v. *DeSalvo*, *supra*. There was no error in admitting the rebuttal testimony.[9]

3. *The presumption of sanity under the Declaration of Rights.* The defendant requests that we invalidate the instruction on the presumption of sanity.[10] In *Commonwealth*

---

[8]Two of the defendant's own experts, Drs. Aranow and Price, did not offer an opinion on the defendant's criminal responsibility.

[9]In his summation, the defendant argued that the failure of the Commonwealth's experts to offer opinions supported his position that he was not criminally responsible.

[10]The judge instructed the jury: "In determining whether the defendant was sane at the time of the alleged crime, you may consider the fact, if

v. *Kostka, supra* at 537, we determined that the presumption of sanity did not violate the due process clause of the United States Constitution. The defendant challenges the instruction under art. 12 of the Massachusetts Declaration of Rights, arguing that, at times, the Declaration of Rights provides a defendant with broader rights than those protected under the United States Constitution. See *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 796 & n.5 (1982), and cases cited. The judge correctly instructed the jurors pursuant to Massachusetts law.[11]

The judge instructed the jury that the Commonwealth had to prove sanity beyond a reasonable doubt. He told the jurors that the defendant did not bear the burden of proving that he was insane. He then informed the jury that most people are sane and from that, they could conclude if they so desired, that the defendant was probably sane. "The charge clearly informed the jurors that they should review all of the evidence, including expert testimony, when deciding whether to draw an inference of sanity." *Commonwealth* v. *Matthews*, 406 Mass. 380, 391 (1990). The judge squarely placed on the Commonwealth the burden of convincing the jurors be-

---

you so desire, that a great majority of men are sane, and the resulting probability that any particular man was sane. It is for the jury to decide whether they draw that inference.

"The fact that I have given you this inference does not mean that you must adopt it. It is something you may not adopt depending on how you view all of the evidence, including the medical evidence given by the psychiatrists and other witnesses who have testified in this case."

[11]Massachusetts does, in fact, require a higher standard than that mandated by the United States Supreme Court. In *Leland* v. *Oregon*, 343 U.S. 790, 799 (1952), the United States Supreme Court upheld an Oregon statute that required the defendant to prove his or her insanity beyond a reasonable doubt. The Court "confirmed that it remained constitutional to burden the defendant with proving his insanity defense when it dismissed, as not raising a substantial federal question, [*Rivera* v. *Delaware*, 429 U.S. 877 (1976)], a case in which the appellant specifically challenged the continuing vitality of *Leland* v. *Oregon*" after *In re Winship*, 397 U.S. 358, 364 (1970), and *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975). *Patterson* v. *New York*, 432 U.S. 197 (1977). Here, the Commonwealth bears the burden of proving criminal responsibility beyond a reasonable doubt. That too is a minority position. See *Commonwealth* v. *Kostka, supra* at 534.

yond a reasonable doubt that the defendant was sane. There was no error in the jury instructions and the defendant was not entitled to any further instructions on the issue of criminal responsibility.

4. *The motion for a new trial.* Rule 25 (b) (2) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 896 (1979), allows a judge to "set aside the verdict and order a new trial, or order the entry of a finding of not guilty, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint." The defendant argues that the judge erred in not granting his motion under rule 25 (b) (2), asserting that the jury's verdict was against the weight of the evidence. We disagree.

We review the judge's decision only to determine whether he "abused his discretion or committed an error of law." *Commonwealth* v. *Gaulden,* 383 Mass. 543, 557 (1981). In *Commonwealth* v. *Cullen,* 395 Mass. 225, 231 n.4 (1985), we suggested that a judge facing a motion for new trial "should consider such factors as the defendant's prior history of, and hospitalization for, mental illness, and the strength of the Commonwealth's circumstantial evidence of sanity, including the testimony of lay witnesses, as well as the absence of expert testimony on behalf of the Commonwealth."

The defendant asserts that we have granted motions for new trial in prior cases similar to, or less compelling than his, and that he therefore is entitled to a new trial. We do not agree.[12] For example, in *Commonwealth* v. *Guiliana,* 390 Mass. 464, 468 (1983), all of the experts agreed that the defendant was not criminally responsible for his conduct because he lacked "both substantial capacity to conform his conduct to the requirements of the law, and substantial capacity to appreciate the wrongfulness of his conduct." The

[12]The cases on which the defendant relies are distinguishable. In each of the cases, the Commonwealth did not offer any expert testimony on the issue of the defendant's mental state. See *Commonwealth* v. *Guiliana,* 390 Mass. 464, 470 (1983); *Commonwealth* v. *Cole,* 380 Mass. 30, 37-38 (1980); *Commonwealth* v. *Mutina,* 366 Mass. 810, 815 (1975); *Commonwealth* v. *Cox,* 327 Mass. 609, 614 (1951).

Commonwealth presented no evidence to support its theory that the defendant's actions were the result of the voluntary ingestion of drugs. *Id.* at 469-470.

The defendant suggests that, as a matter of law and fairness, he is entitled either to required findings or a new trial. The defendant's suggestion essentially amounts to a request that we substitute our judgment for that of jurors in cases in which criminal responsibility is the main issue. We reject that suggestion. "[U]nder our legal system, the responsibility for stating and explaining the law is allocated to the judge, and the duty of deciding questions of fact and of applying the law to the facts is given to the jury." *Commonwealth* v. *Canon,* 373 Mass. 494, 515 (1977) (Abrams, J., dissenting), cert. denied, 435 U.S. 933 (1978). The defendant's argument minimizes the important role of jurors in the criminal justice system.

*Judgments affirmed.*

O'CONNOR, J. (dissenting). Once the issue of insanity has been raised by sufficient evidence, "the Commonwealth must . . . prove a defendant sane beyond a reasonable doubt." *Commonwealth* v. *Kostka,* 370 Mass. 516, 526 (1976). "This is not an insignificant burden, and is a safeguard against erroneous convictions." *Id.* at 536. This has been the rule in Massachusetts for over eighty-five years. See *id.*

Clearly, the issue of insanity (lack of criminal responsibility, see *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 [1967]), has been raised in this case. There was evidence, as characterized by the court, *ante* at 576, of the defendant's "long but sporadic history of mental illness and auditory hallucinations." The evidence also disclosed the bizarre nature of the defendant's conduct — an assault with an automobile on two persons he neither knew nor could have been rationally motivated to harm. In addition, several expert witnesses testified that, at the time of the incident, the defendant suf-

fered from atypical psychosis. There was evidence that atypical psychosis is a psychotic disease; that it is a major mental illness. Two of the defendant's experts testified that, as a result of that major mental illness, the defendant lacked substantial capacity to conform his conduct to the requirements of law, thus satisfying the *McHoul* definition of insanity. One of the two experts also expressed the opinion that, as a result of his psychosis, the defendant lacked substantial capacity to appreciate the wrongfulness of his conduct. Thus, in this case, the issue of insanity was raised and the Commonwealth had the burden to prove beyond a reasonable doubt that, on the morning of April 14, 1990, the defendant either did not have a mental disease or defect or, if he did, he nevertheless had substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. As noted above, this is an important burden, as it is designed to prevent erroneous convictions. *Kostka, supra* at 536.

In spite of the seriousness of this burden, the court has held in cases such as *Kostka, supra* at 529-530, that even where there has been expert testimony of insanity, a jury may rely on the so-called "presumption of sanity" to conclude that a defendant was sane beyond a reasonable doubt. The defendant asks the court to reexamine that rule. The court "decline[s] to do so." *Ante* at 583-584. I am satisfied that, without the presumption of sanity, the evidence in this case was insufficient as a matter of law to warrant a finding beyond a reasonable doubt that the defendant was sane when the incident occurred.[1] If I am right about that, justice re-

---

[1] The court states that it declines to reconsider the *Kostka* decision "because there was expert testimony, which, if believed by the jurors, supported the jurors' conclusion that the defendant was criminally responsible." This statement implies that the court agrees with me that the evidence of the incident itself and the events immediately before and after the incident is insufficient to warrant a finding of sanity; that is, that the experts' testimony is critical. Other statements in the court's opinion, however, suggest that the court has concluded that the jury would have been warranted in finding the defendant sane at the time of the incident on the basis of the nonexpert testimony alone.

quires that the court accede to the defendant's request and examine carefully whether this court should continue to permit a jury to "infer" that a defendant was sane "from their common knowledge that a great majority of people are sane, and the [purely mathematical] probability that any particular person is sane." *Commonwealth* v. *Brennan*, 399 Mass. 358, 364 (1987). *Commonwealth* v. *Kostka*, *supra* at 530. I would depart from those cases and others similarly endorsing such a presumption. The presumption is inconsistent with our long-standing and eminently fair rule that places on the Commonwealth the burden of proving sanity beyond a reasonable doubt when the issue has been raised by evidence of insanity. Once the issue has been raised by sufficient evidence, as it has been here, the presumption should disappear.

I want to make clear at the outset that I do not take the position attributed to me by the court, *ante* at 583, that, in a jury trial, "the question whether to believe the experts" is for the judge, not for the jury. Of course, the question whether to believe the experts or other witnesses is for the jury, not the judge. Further, the jury is free to draw reasonable inferences from facts directly sworn to *if* the evidence, in its entirety, is fairly probative of facts essential to resolution of the issues in the case. It is for the judge, however, in the first instance to determine as a matter of law whether the evidence, viewed in the light most favorable to the party with the burden of proof, would logically support a jury verdict in that party's favor. It is for the judge to determine as a matter of law whether the evidence has left critical matters of proof to conjecture or surmise. If it has, the evidence is insufficient and the party with the burden of proof cannot, as a matter of law, prevail. "When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Berry* v. *Commonwealth*, 393 Mass. 793, 796 (1985), quoting *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). My position is that, as a matter of law, the evidence in this case left the question of the defendant's sanity at the time of the incident to conjecture and surmise. "[T]he evi-

dence and the inferences permitted to be drawn therefrom [were not] 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [sanity] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).

I agree with the court that "the jury is not required to accept the uncontroverted testimony of experts." *Ante* at 579. However, it is equally true that the jury's nonacceptance of the uncontroverted testimony of experts does not warrant the jury's finding that the opposite of the experts' testimony is true. If the jury rejected the opinions of the defendant's experts that the defendant was insane when the criminal conduct occurred, neither those opinions nor that rejection would warrant a jury's finding of sanity beyond a reasonable doubt. "The only result of [the jury's rejection of the opinions of the defendant's experts] is that their testimony is eliminated," leaving the Commonwealth with the burden of persuasion beyond a reasonable doubt as to the defendant's sanity and the related burden of producing evidence in that regard. *Hyslop* v. *Boston & Me. R.R.*, 208 Mass. 362, 367 (1911). See *Commonwealth* v. *Michaud*, 389 Mass. 491, 498 (1983); *Cruzan* v. *New York Cent. & Hudson R.R.*, 227 Mass. 594, 597 (1917), writ of error dism'd, 249 U.S. 621 (1919).

The Commonwealth called three expert witnesses. The court says: "None of these witnesses stated a conclusion as to whether the defendant was able to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, although each offered testimony that supported the Commonwealth's position that the defendant was sane as part of the testimony." *Ante* at 577. It is certainly true that none of the seven expert witnesses, four having been called by the defendant and three by the Commonwealth, testified that the defendant was sane at the time of the incident. So, one might reasonably wonder what each of the Commonwealth's experts may have said that supports the Commonwealth's position that the defendant was sane, as the court

asserts. Although my review of the record discloses testimony that could have resulted in the jury's nonacceptance of the defendant's experts' testimony, thus effectively eliminating that testimony from the case, my review fails to disclose testimony that can fairly be viewed as evidence of the defendant's sanity at the time of the incident. Surely, the Commonwealth's experts' expressions of concern that the defendant could or might have been malingering or that the defendant's conduct could or might have resulted from a personality or character disorder instead of a mental disease or defect, do not warrant an inference that the defendant was sane beyond a reasonable doubt at the relevant time. One thing we know — none of the experts drew an inference that the defendant was sane when the incident occurred.

The Commonwealth's expert witnesses were Drs. Baxter, Carpenter, and Kelso. Dr. Baxter, according to her testimony, conducted an initial screening of the defendant regarding criminal responsibility on April 20, 1990, while working in the Cambridge Court Clinic. She testified that "[a]t the time [she] interviewed [the defendant], there were no indications that, at that time, he was in a psychotic state." She also testified that she wrote in her report that "[i]n her opinion, John Kappler suffers from a mental illness," and that there was evidence to suggest that the defendant was suffering from a mental illness at the time of the April 14 incident. She recommended further evaluation in a hospital setting. No part of Dr. Baxter's testimony supports the Commonwealth's position that the defendant was sane at the time of the criminal incident.

Similarly, no part of Dr. Carpenter's testimony supports the Commonwealth's position that the defendant was sane at the time of the incident. The court states, *ante* at 584, that "two of the Commonwealth's experts testified that there was evidence indicating that the defendant had a personality or character disorder (a condition that does not meet the *McHoul* standard for lacking criminal responsibility). . . . Dr. Carpenter stated that the records of the defendant's psychological test scores were consistent with a personality or

character disorder." Dr. Carpenter's testimony also made clear that the psychological testing he performed did not relate to the defendant's condition at the time of the incident, but only to the post-incident time when Dr. Carpenter administered the tests to the defendant. Dr. Carpenter testified that the tests he administered showed no signs of active psychosis at the time they were administered. It is noteworthy, too, that Dr. Carpenter said he could not rule out the defendant's having a vulnerability to psychosis or the possibility of psychotic disorder. Surely, if, as the court implies, it had been Dr. Carpenter's opinion that, at the time of the incident, the defendant had only a personality or character disorder and not a mental disease or defect as required by the *McHoul* standard, he would also have expressed the opinion that, at the time of the incident, the defendant was criminally responsible. He expressed no such opinion.

The Commonwealth's third expert, Dr. Kelso, testified that, in an attempt to "develop a way of understanding and making sense of the defendant's behavior at the relevant time period," he created three "models" or possible explanations. He offered three such explanations for the defendant's conduct on April 14, 1990, because he "wasn't able to settle on one explanation of the defendant's behavior at the relevant time period that, in [his] way of looking at things adequately explained all or most of the information [he] had." At no time during the course of his testimony did Dr. Kelso identify one model as being the closest or most remote — the best or the worst — explanation of the defendant's conduct.

The court states, *ante* at 581, that Dr. Kelso "rejected" the first model, which assumed that the defendant was suffering from a major mental illness. Dr. Kelso did not testify that he had "rejected" the first model. Rather, he testified that it failed to explain satisfactorily all the defendant's conduct on April 14. A fair reading of Dr. Kelso's testimony reveals that the other two models also failed to explain satisfactorily the defendant's conduct. Dr. Kelso did not reject the first model any more than he rejected the others. This

was made clear by his testimony on cross-examination. The following exchange occurred:

> Q.: "In other words, after all of your review, after all of your models, after all of your interviews, you are unable to reach an opinion as to whether or not he was able to conform his conduct to the law; is that right?"
> A.: "That's correct."
> Q.: "And similarly, after everything you've done, you are unable to come to an opinion, to a reasonable degree of medical certainty, as to whether Dr. Kappler could appreciate the wrongfulness of his conduct?"
> A.: "That's correct."
> Q.: "And in response to [the prosecutor's] questions, you've indicated on the basis of the work and evaluation that you've done, that it may very well be that he couldn't conform his conduct to the requirements of law; isn't that right?"
> A.: "I think so, yes."
> Q.: "And on the basis of all of this, it may very well be that he couldn't appreciate the wrongfulness of his conduct?"
> A.: "Right."
> Q.: "You, personally, were unable to come to a conclusion?"
> A.: "That's correct."

The court also asserts that Dr. Kelso, along with Dr. Carpenter, "testified that there was evidence indicating that the defendant had a personality or character disorder" which would not meet the *McHoul* standard for insanity. As the court puts it, "Dr. Kelso's third model also explained the defendant's behavior could result from a character or personality disorder." *Ante* at 584. If the court is suggesting that Dr. Kelso adopted his third model as the best explanation of the defendant's conduct, the court is wrong, as I have explained above. Also, like Dr. Carpenter, if Dr. Kelso's opinion had been that, at the time of the incident, the defendant had only

a personality or character disorder and not a mental disease or defect as required by *McHoul*, surely Dr. Kelso would have testified that, in his opinion, the defendant was criminally responsible when the incident took place. Instead, he testified that he could not come to such a conclusion. While ordinarily a jury may "believe such portions of [an expert's] testimony as they deemed credible and reject the rest," *ante* at 584, a jury "may not pervert or distort [testimony] by rejecting integral parts of a statement." *Hill* v. *West End St. Ry.*, 158 Mass. 458, 460 (1893). "[A] jury cannot properly be permitted to wrest part from a clear and consistent context so as to attribute to a witness a statement which he did not make." *Lowell* v. *Boston Storage Warehouse Co.*, 280 Mass. 234, 237 (1932). See *Commonwealth* v. *McInerney*, 373 Mass. 136, 144 (1977); *Kettleman* v. *Atkins*, 229 Mass. 89, 91-92 (1918).

Dr. Kelso did not expressly or implicitly say that, in his opinion, the defendant had only a personality or character disorder. Instead, he testified that, in May, 1990, the defendant was suffering from an atypical psychosis, which is "a psychotic disease" and "a major mental illness." Contrary to the court's statement, *ante* at 577, neither Dr. Kelso, nor Dr. Baxter, nor Dr. Carpenter "offered testimony that supported the Commonwealth's position that the defendant was sane as part of the testimony." Additionally, the jury could not properly have picked and chosen fragments of the experts' testimony and pieced them together in a way that might have supported the Commonwealth's position but would have distorted what the witnesses said.

I agree with the court that "the Commonwealth need not present expert evidence to prove that a defendant is sane beyond a reasonable doubt, *Commonwealth* v. *Brennan*, 399 Mass. 358, 364 (1987), and that the fact finder may infer sanity from the 'facts underlying the crime and evidence of [the defendant's] actions before and after the crime.' *Commonwealth* v. *Cullen*, 395 Mass. 225, 229 (1985)." *Ante* at 579. That is not to say, however, that the jury may infer sanity from the facts underlying the crime and evidence of the

defendant's actions before and after the crime when the evidence cannot logically support that inference. The jury cannot lawfully draw such an inference from evidence that leaves the critical question of sanity or insanity to conjecture.

The court states: "The defendant argues that the events before the incident, the incident itself, and his actions afterwards indicate that he was not sane when he committed the crime. . . . We do not agree. The question of what inferences to draw from this evidence is for the jurors, not the trial judge and not this court." *Ante* at 579. Respectfully, I suggest that the court has misconstrued the thrust of the defendant's argument. Recognizing that the burden of proof rests with the Commonwealth, the defendant argues that nothing in the evidence concerning the events before the incident, the incident itself, or the defendant's actions following this incident supports the jury's finding beyond a reasonable doubt that, at the time of the incident, the defendant was sane. The defendant's argument is sound. As a matter of law, which was first for the judge and is now for this court to declare, the jury were not free to draw an inference from the evidence presented that the defendant was sane at the time of the incident.

The court states that on the morning before the incident occurred, "[t]he defendant . . . ate breakfast with his wife, his daughter, her fiancé, and her friend. . . . No one noticed anything unusual about the defendant." *Ante* 575. The only evidence concerning the defendant's appearance on the morning before the incident was the testimony of Tommie Kappler, the defendant's wife. The other persons at the "breakfast," including the defendant, did not testify. Tommie Kappler did not testify that "[n]o one noticed anything unusual" about the defendant. Indeed, it would be unusual for a witness to be permitted to testify concerning what others did not notice. Furthermore, the evidence concerning the "breakfast" was that a member of the group had brought croissants to the defendant's daughter's apartment. Tommie Kappler and one other person (not the defendant) sat and the others stood while the croissants were eaten and coffee

was drunk. Tommie Kappler testified that she reminded the defendant to call the Kapplers' son in New York and that he did so. When asked "[a]t this time did you notice anything unusual about his appearance or conduct," Tommie Kappler answered, "[N]ot at that moment." Then, according to Tommie Kappler's testimony, the defendant left on his planned trip to New York and those remaining "started clearing the things up from the table, and I noticed that he hadn't had much of his coffee and hadn't eaten his croissant, and I made some comment about that." It is highly questionable whether, if there had been evidence that a group of lay people paid attention to the defendant shortly before the incident and failed to notice anything unusual about his appearance, that evidence would have been probative of his sanity. In any event, the question is unimportant here. In this case there is not even that much evidence, only the testimony of one person who, while paying little attention to the defendant, failed to notice anything unusual at one particular moment.

Did the evidence concerning the manner and circumstances of the event itself logically support an inference, beyond a reasonable doubt, that the defendant was sane? For all that appears, the defendant was a man with a long history of mental illness and auditory hallucinations who intentionally struck with his automobile two people he did not know and had no conceivable rational motive to hurt. The incident can only be described as bizarre. It was far more suggestive of insanity than sanity.

The court states, *ante* at 579 n.4, "The Commonwealth argues that the inferences to be drawn from the [defendant's conduct following the incident] permit the jurors to conclude that the defendant was criminally responsible. According to the Commonwealth, the jurors could view the flight to New York as showing consciousness of guilt. Alternatively, the jurors could view the trip to New York as indicating the defendant was in touch with reality because he followed his plan to go to New York that day. Further, the defendant telephoned his wife and followed her instructions to admit

himself to the Payne-Whitney Clinic of New York Hospital. The inferences to be drawn from the evidence were for the jury, not this court." I submit that, as a matter of law for this court to decide, the jury would not have been warranted in inferring from the post-incident evidence of the defendant's conduct, that he was sane at the time of the incident. Surely, no one "in touch with reality" would have thought that he could avoid accountability for his conduct by abandoning his vehicle, easily traceable to him, near the place of the alleged crime. Nor would anyone in touch with reality have run two people down and then simply continued on his or her way to New York as planned and as though nothing eventful had occurred. In any event, the established law of this Commonwealth is that evidence supporting an inference of consciousness of guilt is insufficient by itself to prove guilt. See *Commonwealth* v. *Hamilton*, 411 Mass. 313, 326 (1991); *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982); *Commonwealth* v. *Smith*, 368 Mass. 126, 129 (1975). A fortiori, evidence of consciousness of guilt, which assumes a defendant's rationality, should also be insufficient by itself to prove the defendant's criminal responsibility.

There is, then, as a matter of law, no evidence in this case, expert or otherwise, that would allow a jury to find beyond a reasonable doubt that the defendant was sane, and therefore criminally responsible, when the event occurred. The Commonwealth failed to meet its burden of proving sanity, a burden, as I have said above, which our law imposes on the Commonwealth as "a safeguard against erroneous convictions." *Commonwealth* v. *Kostka, supra* at 536. Therefore, unless the law of the Commonwealth is that, despite expert testimony of insanity and lack of evidence of sanity, the "presumption of sanity" warrants the jury in finding sanity beyond a reasonable doubt, the defendant was entitled as a matter of law to a finding of not guilty by reason of insanity.

The presumption of sanity is inconsistent with our long-standing and just rule placing the burden of proving sanity beyond a reasonable doubt on the Commonwealth when the issue has been raised by evidence of insanity. Once the issue

of insanity has been raised by sufficient evidence, the presumption should disappear. The court noted in *Commonwealth* v. *Ricard*, 355 Mass. 509, 515 (1969), citing *Commonwealth* v. *Cox*, 327 Mass. 609 (1951), that "[t]he probability that any particular man is sane may be of slight if any weight in the face of unanimous psychiatric opinion to the contrary, where it is plainly apparent from the evidence that the act committed is not one that a sane person would have committed, there being no circumstances (anger, revenge, rejection, jealousy, hatred, insult, intoxication, or the like) to account for the murderous act by a sane person." More recently, the court has demonstrated considerably less than full confidence in the presumption of sanity, particularly in the presumption being sufficient by itself to warrant a finding of sanity. See, for example, *Commonwealth* v. *Cullen*, 395 Mass. 225 (1985); *Commonwealth* v. *Lunde*, 390 Mass. 42 (1983); *Commonwealth* v. *Amaral*, 389 Mass. 184 (1983). In those cases, the court did not rely on the so-called presumption. Instead, the court relied on evidence to defeat the contentions of the defendants that the Commonwealth had failed as a matter of law to establish the defendants' sanity. If the court had been truly confident that the presumption is sufficient, the court's lengthy discussion of the evidence in each of those cases would have been surplusage. The same may be said about the court's approach to the present case.

If indeed the burden of proving sanity rests with the Commonwealth, the court should require the Commonwealth to produce evidence (not necessarily expert testimony) focused specifically on the defendant — evidence that logically supports the Commonwealth's contention as to the defendant's sanity. The fact that a great majority of people are sane says little, if anything, about whether a particular defendant was sane when he or she engaged in a type of conduct in which the great majority of people do not engage. The fact that a great majority of people are sane says absolutely nothing about whether the defendant in this case, John F. Kappler, Jr., who had a long history of "mental illness and auditory

hallucinations," *ante* at 576, was sane on the morning that, staring straight ahead, he drove his automobile through a red traffic light on the Alewife Brook Parkway and then onto an adjacent footpath where he intentionally struck two people he had no reasonable or understandable motive to harm, and drove away.

*Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246 (1940), a civil case involving a less exacting burden of proof than the burden of proof in a criminal case, is instructive. There, the court said:

> "The burden of proof that is on the plaintiff in this case does not require him to establish beyond all doubt, or beyond a reasonable doubt, that the insured died from accidental injury within the policy. He must prove that by a preponderance of the evidence. It has been held not enough that mathematically the chances somewhat favor a proposition to be proved; for example, the fact that colored automobiles made in the current year outnumber black ones would not warrant a finding that an undescribed automobile of the current year is colored and not black, nor would the fact that only a minority of men die of cancer warrant a finding that a particular man did not die of cancer. . . . The weight or preponderance of evidence is its power to convince the tribunal which has the determination of the fact, of the actual truth of the proposition to be proved. After the evidence has been weighed, that proposition is proved by a preponderance of the evidence if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there."

(Citations omitted.) *Id.* at 250. Accord, *Stepakoff* v. *Kantar*, 393 Mass. 836, 843 (1985); *King's Case*, 352 Mass. 488, 491-492 (1967); *Tartas's Case*, 328 Mass. 585, 587 (1952); *Smith* v. *Rapid Transit, Inc.*, 317 Mass. 469, 470 (1945).

Surely, if "the fact that only a minority of men die of cancer [would not] warrant a finding that a particular man did not die of cancer," *Sargent, supra* at 250, the fact that a large majority of people are sane would not warrant a finding that a particular person was sane. This is especially true as applied to this case in which the defendant engaged in senseless conduct — conduct in which, according to common knowledge, the great majority of persons do not engage. Surely, also, if a mathematical probabilities formula does not lead to a valid conclusion about a specific individual by a preponderance of the evidence, the "presumption of sanity," which is merely a mathematical formula, cannot lead to a valid conclusion about a specific individual beyond a reasonable doubt.

I would reverse the judgments and order judgments, as to each indictment, of not guilty by reason of insanity.

ABRAMS, J. (concurring). The present case illustrates the difficulties which arise when the prosecution bears the burden of proving criminal responsibility beyond a reasonable doubt. In 1976, when we decided *Kostka*, only twenty-three States required the defendant to prove lack of criminal responsibility. *Commonwealth* v. *Kostka*, 370 Mass. 516, 527 (1976). Currently, thirty-six jurisdictions (including the Federal government and the District of Columbia) place on the defendant the burden of proving lack of criminal responsibility.[1] Were I to reconsider our decision in *Kostka, supra*, I

[1]*Riley* v. *State*, 830 S.W.2d 584 (Tex. Crim. App. 1992); *Bass* v. *State*, 585 So.2d 225 (Ala. Crim. App. 1991); *State* v. *Zmich*, 160 Ariz. 108 (1989); *State* v. *Hankins*, 232 Neb. 608 (1989); *State* v. *Rough Surface*, 440 N.W.2d 746 (S.D. 1989); *Hoey* v. *State*, 311 Md. 473 (1988); *People* v. *Kohl*, 72 N.Y.2d 191 (1988); *Commonwealth* v. *Sohmer*, 519 Pa. 200 (1988); *State* v. *James*, 393 N.W.2d 465 (Iowa 1986), appeal dismissed, 481 U.S. 1009 (1987); *People* v. *Moore*, 147 Ill. App. 3d 881 (1986); *Brooks* v. *State*, 706 P.2d 664 (Wyo. 1985); *State* v. *Messier*, 145 Vt. 622 (1985); *Price* v. *State*, 412 N.E.2d 783 (Ind. 1980); *State* v. *Linder*, 304 N.W.2d 902 (Minn. 1981); *State* v. *Howze*, 66 Ohio App. 2d 41 (1979); *Cooper* v. *United States*, 368 A.2d 554 (D.C. 1977); *McDonald* v. *Commonwealth*, 554 S.W.2d 84 (Ky. 1977); *State* v. *Caryl*, 168 Mont. 414

would join the increasing majority of States which place the burden of proving lack of criminal responsibility on the defendant. In any case in which the issue of criminal responsibility was raised, there would be a case for the jury on that issue,[2] but there would be no need for an instruction on the presumption of criminal responsibility.[3]

---

(1975); *State* v. *DiPaglia*, 64 N.J. 288 (1974); *State* v. *Durgin*, 311 A.2d 266 (Me. 1973); *In re Franklin*, 7 Cal. 3d 126 (1972); *Riggins* v. *State*, 226 Ga. 381 (1970); *State* v. *Hinson*, 253 S.C. 607 (1970); *Ray* v. *State*, 262 A.2d 643 (Del. 1970); *State* v. *Holmes*, 439 S.W.2d 518 (Mo. 1969); *State* v. *Atkinson*, 275 N.C. 288 (1969); *State* v. *Marks*, 252 La. 277 (1968), vacated as to death penalty, 408 U.S. 933 (1972); *Gallegos* v. *State*, 84 Nev. 608 (1968); *State* v. *Haggblom*, 249 Or. 676 (1968); *State* v. *Page*, 104 R.I. 323 (1968), overruled on other grounds sub nom. *State* v. *Johnson*, 119 R.I. 749 (1978); *Taylor* v. *Commonwealth*, 208 Va. 316 (1967); *State* v. *Piche*, 71 Wash. 2d. 583 (1967), cert. denied, 390 U.S. 912 (1968); *Stewart* v. *State*, 233 Ark. 458, cert. denied, 368 U.S. 935 (1961); Alaska Stat. § 12.47.01 (1990); N.H. Rev. Stat. Ann. § 628:2 (1986 & Supp. 1992); 18 U.S.C. § 17 (1992).

[2] In South Carolina, the defendant bears the burden of proving lack of criminal responsibility. However, South Carolina explicitly requires the government to offer rebuttal evidence once the defendant offers evidence of lack of criminal responsibility. Of the States where the defendant bears the burden of proving lack of criminal responsibility, South Carolina is the only State with this requirement. See *State* v. *Milian-Hernandez*, 287 S.C. 183 (1985). In two States the issue whether the government must offer evidence in rebuttal is unclear. See *Bass* v. *State*, 585 So. 2d 225, 233 (Ala. Crim. App. 1991); *State* v. *Sommerville*, 111 Wash. 2d 524, 530 (1988).

[3] The States which place the burden of proof of criminal responsibility on the defendant are divided on whether there should be an instruction on the presumption of criminal responsibility. I would follow those jurisdictions which do not require an instruction on the presumption of criminal responsibility.